THE STATE OF KANSAS, *Appellee*, v. A. A. TRUSKETT, *Appellant*.

No. 17,647.

SYLLABUS BY THE COURT.

1. CRIMINAL LAW—*Information—Sufficiency Of.* Where an information for murder plainly charges that the defendant shot and killed the deceased with a pistol loaded with powder and balls, an allegation that a mortal wound was inflicted thereby is unnecessary.

2. ——— *Jurors.* Exceptions to the qualifications of jurors and to the refusal of a continuance are examined but not sustained.

3. ——— *Issues—Law and Fact.* Where a question is purely one of law, although arising in a criminal case, it is exclusively for the court. But the general rule is that questions of fact are exclusively for the jury.

4. ——— *Question of Fact—Evidence—Inference.* A homicide was committed in a water-closet detached from any other building, by shooting with a revolver. The two men were observed entering the closet, and coming therefrom, the deceased being wounded and making exclamations of distress, and the appellant following him with the revolver in his hand but making no effort to use it or to do violence. Two shots were fired which were heard by persons near by, but no one saw the deed. Aside from the declaration of the appellant soon after the occurrence that he had shot the deceased and that he had to do it, the circumstances, conversations or statements, if any, attitude, manner and conduct of the men while in the closet could only be determined from the outward circumstances, there being no eyewitness of the tragedy. It is *held* that what transpired within the closet (except the firing of the shots) was a matter for inference, not of law for the court, but of fact for the jury.

5. ——— *Self-defense—Instruction.* In the situation stated in the last preceding paragraph, the appellant claiming that he shot in self-defense, and that being one of the issues, instructions should have been given on that subject, and the refusal to give such instructions was erroneous.

6. ——— *Same.* An instruction to the effect that there was no evidence for the jury to consider tending to justify the killing, considered in connection with the refusal to instruct con-

cerning self-defense, was, in the circumstances shown upon the trial, erroneous.

7. ——— *Other Exceptions Not Sustained.* Other exceptions to the proceedings are considered but not sustained.

Appeal from Montgomery district court. Opinion filed November 11, 1911. Reversed.

*J. R. Charlton, S. H. Piper, Charles D. Welch,* and *Charles Bucher,* for the appellant.

*John S. Dawson,* attorney-general, *Hal R. Clark,* county attorney, *J. W. Holdren,* deputy county attorney, *T. H. Stanford,* and *G. T. Stanford,* for the appellee.

The opinion of the court was delivered by

BENSON, J.: The appellant, A. A. Truskett, was convicted of murder in the second degree, in killing J. D. S. Neely, at Caney, on January 7, 1911. The grounds of appeal are: that the information was defective; that a motion for a continuance was improperly refused; that several jurors were incompetent; and that erroneous rulings were made respecting evidence and in giving and refusing instructions.

The information was direct and certain, and the offense was clearly charged as required by the criminal code. (Crim. Code, §§ 104, 109.) The criticism is that it was not charged in the information that a mortal wound was inflicted upon the deceased. As the information, in ample form, charged that the appellant shot and killed the deceased with a pistol, it seems a wound was inevitable—a shot that kills, in the ordinary course of events, must wound. It is true that in many of the time-honored forms of indictment the infliction of a mortal wound is set out, and it may be that some courts have held the omission of such an allegation fatal, but our statute provides simple rules which fully protect the rights of the accused without needlessly encumber-

ing the record with useless repetition and verbiage. A person who is plainly charged with willful, deliberate and premeditated murder by shooting another with a revolver can not fail to understand the nature of the charge whereof he is accused.

The jurors were examined at length respecting opinions and prejudices. They had read newspaper reports such as are usually published in cases of homicide. As ordinarily happens, apparently contradictory answers were given in some instances. From some of the answers settled opinions respecting the issue of guilt or innocence appeared, but further examination revealed that no fixed opinions had been formed, and only such impressions were made as are usually incidental to such reading, without leaving any real conviction on the subject. The court patiently endeavored, through examination by counsel and by an occasional question from the bench, to ascertain whether a challenged juror was really disqualified because of his opinions upon the issue. This subject has been recently considered in *The State v. Stewart,* ante, p. 404, 116 Pac. 489. Within the principles stated in the opinion in that case, the court did not err in overruling the challenges. It should be observed that the fact of killing was not controverted on the trial, and so a belief that the appellant had killed the deceased was unimportant unless there was a settled opinion that the killing was criminal.

The appellant asked for a continuance to procure the testimony of three witnesses, two of whom, however, appeared at the trial. The proposed testimony of the other witness related to a matter remotely material, as tending to show the appellant's state of mind at a particular time, but there was nothing to show that the fact could not be proven by other witnesses, and the history of the transaction of which this was a comparatively unimportant part was given by other testimony upon the trial.

A more serious question arises upon exceptions to

instructions given and refused, and this requires a
brief statement of the facts. The appellant is a resi-
dent of Caney, and was sixty-three years old at the time
of the homicide. In a joint venture with his nephew, he
had purchased in the spring of 1910 an oil lease upon
lands in Oklahoma, near Caney, belonging to an Indian
owner who was a minor at the time, but upon whom the
rights of majority had been conferred by an Oklahoma
court. The Indian agreed to make other papers, if
necessary, when he became of age. Previous to this
lease—which was made to one Overfield, and assigned
to the Trusketts—another lease had been made by a
guardian to the Lenox Oil & Gas Company, which by its
terms expired on September 24, 1910. The Indian
owner became of age on September 26, 1910. There
was testimony tending to show that some time in April,
1910, a person in the employment of the Wichita Na-
tural Gas Company induced the Indian owner to leave
his home in Oklahoma and go with him on a roving trip
through several states, stopping for brief periods in
various cities, visiting places of resort and amusement;
that they returned to Oklahoma on September 25, and
the Indian owner conveyed the land by warranty deed
to another person, for the use of the gas company, on
the next day, being then of full age. In the meantime,
about September 15, the guardian of the Indian had
made another lease to one Closser, for the benefit of
the Wichita Natural Gas Company, without considera-
tion, to enable that company to keep possession until a
suit could be filed. The appellant was advised by his
attorney that the statute allowing the rights of ma-
jority to be conferred by the court did not apply to
Indian allotments, and he became anxious about his title
to the lease. When the original guardian's lease ex-
pired he appeared on the ground to take possession, but
found there a large number of men, some of whom were
armed, who refused to allow him to take possession,
and who, as appellant was informed and believed, were

holding possession for the Wichita Natural Gas Company. The appellant commenced an action in an Oklahoma court to restrain the gas company and others from obstructing him in taking possession, and Closser commenced an action in a federal court to restrain appellant from interfering with his possession.

Mr. Neely was about sixty-one years of age, and resided in Ohio. He was president of the Wichita Natural Gas Company, and was in the habit of visiting Caney and vicinity occasionally, and when there stayed at the Palace hotel. He left his home soon after January 1, 1911, and after spending a short time in the vicinity reached the Palace hotel on January 6, and remained there over night. Early in the morning of January 7 the appellant called at the hotel and inquired if Mr. Neely was there, and asked how long he would stay, and was informed by one of the proprietors that he would stay three or four days. He remained in the office, and was walking about when Mr. Neely came downstairs, a little before seven o'clock. Mr. Neely read a letter, and then went out through a rear door and passed along a walk to a detached water-closet. The appellant then left the office through a front door and passed along a walk leading around a part of the building to the rear walk and on into the closet. Very soon two shots were heard in quick succession, and Mr. Neely was seen coming out of the closet holding his side and exclaiming, "Oh! oh! oh!" and was soon followed by the appellant, holding a revolver in his hand, who proceeded along the walk to the front of the hotel. Mr. Neely fell before reaching the door of the hotel out of which he had come, and soon after expired. One bullet entered the breast and passed through the heart and out below the right armpit. The other entered the abdomen and lodged in the tissues below the point of exit of the upper bullet. The appellant was next seen at his nephew's store about a block distant, when he said, "I have shot Neely. I had to do it. Where is Will?"

Immediately in front of the door of the closet was a
urinal, and a hall along the side opened into three com-
partments.   The movements of the two men to and
from the closet were seen by witnesses, who also heard
the shots.   There was no eyewitness of the shooting or
of the relative position or action of the parties at that
time, and no testimony of any conversation or of any
statements made by either of them.   The time between
the shooting and the statement of the appellant, just
related, is uncertain, but only a short time, possibly a
few minutes, intervened.   There was a window at each
end of the hall in the water-closet, which closet was
thirteen feet long.   At the time of the shooting the
light in the closet was probably dim.

The hotel was on the road leading from the appel-
lant's home to the railway station.   When appellant
came to the hotel that morning he stated that he had
got up early to take the morning train for Bartlesville,
but had missed it.   (It was due to leave at 6:33 A. M.)
His attorney, with whom he had frequently consulted
concerning the lease, and who represented him in the
suits relating to it, resided at Bartlesville.   Counsel for
appellant stated in his opening address to the jury, in
substance, that when his client went to the closet he did
not know of Neely's presence there, but on seeing him,
having a settlement of the litigation on his mind, said:
"I want to see you after a while, when you get time,
and see if we can not do something toward settling our
difficulties; I would like to see you about it"; and that
Mr. Neely responded: "You can see me right now,"
and started toward him with one hand at his hip and the
other in front of him; and that thereupon the appellant
said, "Stop! stop!" but Neely still coming on, he shot
him in self-defense, believing that his life was in immi-
nent danger.   It was also claimed by the defense that
the appellant, being in poor physical health and wor-
ried over his troubles, was insane at the time and not
responsible for his act.   Evidence was adduced tending

to show the matters concerning the leases, the failure to get possession, the spiriting away of the Indian owner of the land, his subsequent conveyance of the title, and the resulting litigation. Also, that appellant had been recently enfeebled by disease and was anxious and worried over the business matters referred to. This evidence was allowed, as bearing upon the condition of his mind and the question of his sanity. Several witnesses having an opportunity to observe testified that they believed that he was not of sound mind. On the other hand, witnesses for the state testified that in their opinion he was of sound mind.

The court submitted to the jury by proper instructions the question whether the appellant was insane at the time the killing was done, but refused to give instructions concerning justifiable homicide, and failed to instruct them concerning manslaughter.

Evidence was given tending to prove that the deceased was strong in character, persistent in overcoming obstacles and quick in action, and that it was his habit in talking to put his hands to his hips, or of putting one hand to one of his hips. In rebuttal the state was allowed, over the appellant's objection, to give evidence that the general reputation of the deceased was that of a good, peaceable, quiet, honorable, upright and law-abiding citizen.

The appellant requested instructions concerning the right of self-defense, which were refused, and the court instructed the jury that no evidence had been offered in support of the statements made by the attorney for the appellant in his opening address of a conversation in the closet and the threatening attitude of the deceased, and added:

"No evidence whatever has been offered or presented here, showing such an occurrence, or any threat, or attack, or assault, or threatened assault of any kind or character upon the defendant, Truskett, by John D. S. Neely, that would justify the killing of said John D. S. Neely by the defendant, Truskett, and you are in-

,structed to entirely disregard such unsupported state-
ment of counsel."

It was proper to call attention to the fact that the
statement of counsel made with such particularity of
·detail was not to be considered as evidence, but the
language used, when considered in connection with the
refusal to submit the question of self-defense to the
jury, and · the failure to instruct concerning man-
slaughter, in effect withdrew the consideration of the
matter of self-defense from the jury, leaving them only
to find whether the appellant was insane, and if not, ·
then whether the killing was murder in the first or in
the second degree.

Where a question is purely one of law, although aris-
ing in a criminal case, it is exclusively for the court.
(*The State v. Bowen,* 16 Kan. 475.)   But the rule, sub-
ject to some exceptions not involved in this case, is
that questions of fact are exclusively for the jury.   As
stated in the opinion in *The State v. Jackson,* 42 Kan.
384, 22 Pac. 427:

"In criminal cases it is never competent for the court
to take a *question* of fact away from the jury and to de-.
cide it itself.   Of course a necessary fact may in some
cases not be a *question* of fact, for the fact itself might
be admitted by the parties, or it might not be disputed,
and the entire and uncontradicted evidence in the case
might clearly, unquestionably, conclusively and directly
prove the same."   (p. 386.)

In this case it was primarily a question of fact
whether the appellant shot Neely; however, that was
not a question for the jury, for the shooting was ad-
mitted in the opening statement, but it was a question
whether the shooting was done maliciously or whether
it was done in self-defense.   Aside from his own decla-
ration made soon after the occurrence, the circum-
stances, conversation or statements, if any, attitude,
manner and conduct of the parties could only be deter-
mined from the outward circumstances, for there were

no eyewitnesses to the tragedy. What transpired within the closet is entirely a matter of inference, not of law but of fact.

"Presumptions of fact are questions of fact. They are merely the major premises of those inferences which juries are at liberty to draw, in the light of their experience as men of the world, from facts directly proved. Another judge long ago said: 'A presumption of any fact is properly an inferring of that fact from other facts that are known; it is an act of reasoning.' It is in the nature of a logical inference or argument. It is, says another writer, 'a logical argument from a fact to a fact; or, as the distinction is sometimes put, it is an argument which infers a fact otherwise doubtful from a fact which is proved.'" (1 Ell. Ev. § 81.)

Professor Thayer says:

"That this determination by the jury involves a process of reasoning, of judgment and inference, makes no difference; for it is the office of jurors 'to *adjudge upon their evidence* concerning matter of fact, and thereupon to give their verdict; and not to leave matter of evidence to the court to adjudge, which does not belong to them.'" (Thayer, Prel. Treatise on Ev. at the Common Law, p. 189.)

In *The State v. Smith,* 13 Kan. 274, this court in reviewing an instruction which informed the jury that the law presumes an illegal conversion from certain facts, said:

"Ordinarily, a jury might well draw such an inference from such facts; but the court below says in effect that they are *compelled* to draw such an inference, and this, in our opinion, is an unauthorized assumption by the court of a duty that belonged exclusively to the jury." (p. 298.)

This rule is also applied in the consideration of a demurrer to the evidence, for it is the province of the jury not only to consider the facts directly proven but inferences from such facts. (*Brown, Adm'r, v. A. T. & S. F. Rld. Co.,* 31 Kan. 1, 1 Pac. 605.) The jury are not only to consider the various acts constituting what

The State v. Truskett.

Wigmore calls "the outward part of a crime," but such inferences therefrom as reason, common sense, and ordinary observation and experience may lead them to deduce. Wigmore, in speaking of presumptions as related to the burden of proof, says:

"The various acts constituting the outward part of a crime are sometimes said to constitute a presumption of *malice* or *criminal intent.* But most of these instances are to-day understood to be either 'conclusive presumptions,' *i. e.,* rules of substantive law defining the criminal act, or else mere inferences of fact not affecting the accused with a duty to produce evidence." (4 Wig. Ev. § 2511*b.*)

Courts have sometimes fallen into the error of laying down as imperative presumptions of law, propositions which are only permissive inferences. (1 Ell. Ev. § 83; 4 Wig. Ev. §§ 2490, 2491.) This subject was treated by the supreme court of Michigan in a case concerning the effect of evidence of good character to rebut the presumption of malice from certain facts. It was said by Chief Justice Cooley in the opinion:

"The difficulty at this point lies in attempting to surround the jury with arbitrary rules as to the weight they shall allow to evidence which has properly been placed before them. This court has several times found it necessary to declare that no such arbitrary rules are admissible. We refer particularly to the cases of *People v. Jenness,* 5 Mich. 305; *Maher v. People,* 10 id. 212, and *Durant v. People,* 13 id. 351. The trial of criminal cases is by a jury of the country, and not by the court. The jurors, and they alone, are to judge of the facts, and weigh the evidence. The law has established this tribunal because it is believed that, from its numbers, the mode of their selection, and the fact that the jurors come from all classes of society, they are better calculated to judge of motives, weigh probabilities, and take what may be called a common-sense view of a set of circumstances, involving both act and intent, than any single man, however pure, wise and eminent he may be. This is the theory of the law; and as applied to criminal accusations, it is eminently wise, and favorable alike to liberty and to justice. But to give it full effect,

the jury must be left to weigh the evidence, and to examine the alleged motives by their own tests. They can not properly be furnished for this purpose with balances which leave them no discretion, but which, under certain circumstances, will compel them to find a malicious intent when they can not conscientiously say they believe such an intent to exist." (*The People v. Garbutt*, 17 Mich. 9, 27.)

The rule that inferences from the direct or outward facts attending an alleged crime, where there is no eyewitness of the occurrence, are for the jury, has been applied in Kentucky in several cases of homicide, and it was held that in such a situation the jury must be allowed to determine whether the killing was excusable, justifiable or felonious, as the character of the act, whether criminal or justifiable, must be inferred as a fact from the outward circumstances. In *Rachford v. Commonwealth*, 16 Ky. Law Rep. 411, 28 S. W. 499, the court said:

"How can it be said that the jury are the sole judges of the facts if the law leaves them to conclude only that the accused committed the homicide with malice aforethought? Ordinarily, the instructions must conform to the proof, and be suggested by the proof; but, where there is none showing the facts attending the killing, the law applicable to murder, manslaughter, and self-defense must be given."

In another case the court said:

"No one saw, or professed to have seen, both the deceased and the appellant at the moment when the shooting was done, or for some moments before. . . . In that case the facts attending the killing must be ascertained wholly from circumstances.

"The homicide may then have been excusable self-defense, manslaughter, or murder. The facts attending the killing must be ascertained in order to ascertain to which category the killing belongs. It is the province of the jury to ascertain these facts, and the court erred in refusing to instruct in the law of manslaughter. In doing so the court took upon itself to decide that no facts existed which could reduce the killing to manslaughter. That action, as stated by the learned judge,

The State v. Truskett.

was based on the ground that there was no evidence
whatever 'going to show that the killing was done in
sudden heat and passion,' and therefore an instruction
as to the law of manslaughter would be abstract and
misleading.

"The same reasoning would equally apply to an in-
struction in regard to the law of self-defense, and the
instruction given on that subject might have been re-
fused with equal propriety. If the jury had a right
from the circumstances in evidence before them to in-
quire whether the killing was done in self-defense, they
had an equal right to inquire whether it was not done
under circumstances which made it manslaughter.

"When no witness introduced on the trial saw the
homicide committed, or saw the parties after they met
on the occasion when the killing occurred, the law ap-
plicable to murder, manslaughter and self-defense
should be given, in order to meet any state of fact the
jury may find, from the circumstances in evidence, to
have existed." (*Rutherford v. Commonwealth*, 76 Ky.
608, 611.)

In a later case, reviewing those just cited and others
in that state, the court of appeals of Kentucky affirmed
the principle declared in the previous cases. The body
of the victim—a woman—bore marks of fatal violence,
and the ground, bushes and grass bore evidence of a
struggle. The accused made a statement to the sheriff
that he had killed her, but that he had to do it. Evi-
dence was also given of the imprint of a shoe going in
the direction of appellant's home from a place near
where the body was found. The accused did not testify.
The court, referring to the admission of the accused,
held that it must be considered, in connection with the
accompanying declaration that he had to do it, and
passing to the alleged error upon the refusal to instruct
concerning the right of self-defense, said:

"It is most forcibly urged (that the victim), was a
defenseless woman, and the accused a strong, able-
bodied man, still there can be no question but what
he would have been entitled to an instruction author-
izing his acquittal if the jury believed that he acted in
his necessary, or to him apparently necessary, self-

defense. The fact that he offered no evidence in his own behalf can not be allowed to militate against him. If the facts which the commonwealth brought out in evidence showed that by any possibility the killing might have been done by accused in self-defense, then he was entitled to have that phase of the law presented to the jury. . . . Inasmuch as the appearance of the ground shows that there had been a struggle, and accused is alleged to have said that he did the killing because he had to, it is possible that it might have been done in self-defense, and, if possible that it might have been so done, then the jury should have been instructed accordingly." (*Frazier v. Commonwealth*, [Ky. 1908] 114 S. W. 268, 269.)

It is true that in the above quotation some weight is given to the indications of a struggle, for there a knife had been used upon the victim and wounds as if made by a stone were found upon her head, and that a struggle had occurred seemed probable, but where only a gun is used a previous struggle is not a usual accompaniment, and in such a case the principle decided is applicable apart from the indications of a struggle. Conceding that the statement made by the appellant immediately after the homicide, that he had shot Neely and that he had to do it, was not part of the *res gestæ,* and was therefore admissible, as the court ruled, only as bearing upon his mental condition, still it must be remembered that substantially the same statement was made to the sheriff in the afternoon, as testified to by that officer as a witness for the state. It is true that part of the remark was self-serving, but it was a part of one statement, offered we must presume as an admission tending to prove guilt, and must be considered as a whole and its effect left to the jury. (*The State v. Brown,* 21 Kan. 38; *Johnson v. Powers,* 40 Vt. 611, 612.) It is true the jury might have believed the first part and rejected the last part of the statement, but it was their province to do so and not that of the court.

The statutes of this state carefully limit the function

of the court, reserving to the jury the exclusive right to decide the facts. Section 236 of the criminal code provides:

"If he [the judge] presents the facts of the case, he must inform the jury that they are the exclusive judges of all questions of fact."

In *Carl Horne v. The State of Kansas*, 1 Kan. 42, an instruction which referred to the homicide as "this murder" was held erroneous. The court said:

"If it be considered as presenting the facts, or suggesting a conclusion from facts, it is equally error. If the first, it is error because the jury were not informed that they were the exclusive judges of the facts. If the second, it is error because it was intimating a conclusion from facts, which is the special and exclusive province of the jury." (p. 74.)

While in this case the jury were properly informed that they were the exclusive judges of the facts, still the decision that there was no evidence of self-defense for the jury to consider was a conclusion from outward circumstances which, as held in that case, was the exclusive province of the jury.

In *The State v. Moore*, 67 Kan. 620, 73 Pac. 905, the defendant contended that a conviction of murder in the second degree should not be upheld because the facts warranted only an acquittal, the jury by their verdict having found that he was not guilty of murder in the first degree, but the court said:

"The evidence in the case was wholly circumstantial. No one saw the deed who could be used as a witness by the state, and in finding a verdict the jury were confined to an interpretation of the dumb memorials outraged nature herself preserved. This court is not prepared to say that a state of facts could not exist under the evidence involving purpose and malice but excluding deliberation and premeditation. There may have been a quarrel and the larceny may have been an afterthought." (p. 626.)

The same principle applies here; no one having seen

the deed, inferences from the memorials and outward circumstances were for the jury. This principle that inferences of fact are for the jury was applied in *The State v. Clark*, 69 Kan. 576, 77 Pac. 287. It was stated that:

"The effect of the instructions given was a ruling by the court that the circumstances of the homicide confined the offense to a willful, deliberate and premeditated killing, which is murder in the first degree, or to a murder done purposely and maliciously, but without deliberation and premeditation, which is murder in the second degree." (p. 581.)

Commenting on the evidence, it was held in that case that the jury should not have been precluded from finding a lesser degree. The following excerpt was included in the opinion:

"On the trial of a person indicted for murder, although the evidence may appear to the court to be simply overwhelming to show that the killing was in fact murder, and not manslaughter or an act performed in self-defense; yet, so long as there is evidence relevant to the issue of manslaughter, its credibility and force are for the jury, and can not be matter of law for the decision of the court. (*Stevenson v. United States*, 162 U. S. 313, syl.)" (69 Kan. 584.)

The same rule should apply to justifiable homicide, or self-defense, as to the lesser degrees, and was so applied by this court (*The State v. Demming*, 79 Kan. 526, 100 Pac. 285), where it was contended that the admitted facts compelled an acquittal. It was there said:

"But the question whether under all the circumstances the defendant was justified in shooting him was clearly one for the determination of the jury. . . . Although the testimony was largely undisputed, the guilt or innocence of the defendant depended upon the inferences to be drawn from it, and these inferences were for the jury." (p. 527.)

The language of Chief Justice Johnston in *The State*

*v. McAnarney,* 70 Kan. 679, 79 Pac. 137, is pertinent here:

"Since there was no direct evidence as to the facts attending the killing, the court can not assume to decide what the facts are. The manner of the killing and the purpose of the defendant at the time are necessarily questions for the jury." (p. 687.)

It is not decided that the court may not in a proper case, where the direct facts showing the commission of a crime are given in evidence by those who witnessed the occurrence, state to the jury that there is no evidence to sustain a particular issue. But where there is no eyewitness of the killing and the evidence is wholly circumstantial, leaving inferences to be drawn in order to determine the facts in immediate relation to such killing, it should be left to the jury to draw such inferences, and determine whether the act is criminal.

It must be remembered that the burden of proof was not upon the appellant to show that he acted in self-defense, for in criminal cases the burden never shifts to the defendant to prove innocence but remains upon the prosecution to prove guilt until it is established beyond a reasonable doubt. When a homicide occurs it is either murder in the first or second degree, manslaughter in one of its degrees, or justifiable or excusable homicide, according as the evidence may show, and that the act is murder or manslaughter must be shown, otherwise the presumption of innocence applies. Guilt may be shown from circumstances, and that a killing was malicious or unlawful may be found from outward facts proven or admitted; but the finding, being one of fact, is for the jury. In the same manner and by the same reasoning the jury may find whether the act was justifiable, or criminal in an inferior degree.

No discussion is indulged in of the weight or weakness of any inference that might be drawn from the evidence in this case. It is only held that these are matters of fact for a jury, however weak or incon-

clusive they may be, if the elements of self-defense were not necessarily excluded by the undisputed evidence. It is not necessary to critically consider the proposed instructions presented by the appellant respecting self-defense. They were amply sufficient to challenge the attention of the court to that subject, and instructions upon it should have been given and the refusal to do so was error. (*The State v. Jackett,* 81 Kan. 168, 174, 105 Pac. 689.) While the same duty rested upon the court to inform the jury concerning the lower degrees as to instruct concerning self-defense, yet in the absence of a request to do so the omission was not, in this instance, erroneous. (*The State v. Newton,* 74 Kan. 561, 87 Pac. 757.) The careful preparation of instructions concerning self-defense indicates a purpose to waive instructions concerning manslaughter. (*The State v. Winters,* 81 Kan. 414, 105 Pac. 516.)

The court admitted evidence of the good character of the deceased. Such evidence is permissible in cases of homicide where there is evidence that the deceased was of a turbulent or quarrelsome disposition, which may be offered in support of a claim of justification. If there was any evidence of a turbulent or quarrelsome disposition in the deceased it was very slight, but perhaps enough to justify evidence in rebuttal limited to the characteristics material to the inquiry. The admission of the evidence relating to the character of the deceased is consistent with the appellant's theory of self-defense. With that matter eliminated the evidence was irrelevant. (*The State v. Potter,* 13 Kan. 414.)

An instruction relating to circumstantial evidence was requested and refused. It has been held that an instruction upon that subject should be given if requested where the evidence is such that the conviction might be upon circumstantial evidence alone. (*The State v. Andrews,* 62 Kan. 207, 61 Pac. 808, as applied in *The State v. Gereke,* 74 Kan. 200, 87 Pac. 759.) As

stated in the case last cited, when the circumstantial evidence is incidental to, or corroborative of, direct evidence the refusal to give the instruction is not erroneous. In the view we have taken an instruction embodying the principle, as approved by several decisions of this court, should have been given, although upon the theory that there was nothing for the jury to consider to support the claim of self-defense its refusal was not erroneous.

Referring to other specifications of error, it is sufficient to say that there was no error in the ruling respecting evidence of threats. It was for the jury to find whether they related to the deceased and their import in the connection with which they were uttered. The clothing of the deceased was properly in evidence. (*The State v. Jackett,* ante, p. 427, 116 Pac. 509.) The evidence of nonexpert witnesses who testified concerning the appellant's sanity was properly received, sufficient opportunity for observation on their part having been shown. The weight of their opinions was for the jury. (*Fish v. Poorman,* ante, p. 237, 116 Pac. 898.)

Other minor questions are presented in the briefs but do not require comment. The conduct of the trial and rulings, except as herein criticized, are not subject to any just complaint.

The judgment is reversed and the cause remanded for a new trial.