[Criminal No. 779. Filed December 12, 1932.]

[16 Pac. (2d) 720.]

WINNIE RUTH JUDD, Appellant, v. STATE, Respondent.

Mr. O. V. Willson, Mr. Frank Dykes, Mr. Howard G. Richardson, Mr. Erwin H. Karz, Mr. Jacob Morgan, and Mr. Arthur C. Verge, for Appellant.

Mr. K. Berry Peterson, Attorney General, Mr. J. R. McDougall and Mr. R. B. Salmon, Assistant Attorneys General, and Mr. Lloyd J. Andrews, County Attorney, for the State.

JENCKES, Superior Judge.—The defendant and appellant, Winnie Ruth Judd, was tried in the superior court of Maricopa county upon a charge of murdering one Agnes Ann Le Roi on or about the 16th day of October, 1931. The jury returned a verdict of murder in the first degree and fixed the punishment at death. From the judgment of con-

viction and from the order of the trial court denying her motion for a new trial the defendant prosecutes this appeal.

The evidence adduced by the State in support of the charge was substantially as follows: The appellant, a young married woman, who will hereinafter be designated either as the defendant or Mrs. Judd, was on and for some time prior to the 16th day of October, 1931, residing apart from her husband, Dr. William C. Judd, in Phoenix, Arizona. She and the deceased, Agnes Ann Le Roi, were employed at the Lois Grunow Memorial Clinic. The latter resided with another woman by name Hedvig Samuelson, familiarly called "Sammy," in an apartment located at 2929 North Second Street, and Mrs. Judd resided in an apartment at 1130 East Brill Street in Phoenix, Arizona. These three women were intimately acquainted with one another. The defendant was a frequent visitor at the apartment of the other two women on Second Street and had opportunity to become familiar with the arrangement of the rooms and of the furniture and with the personal habits and customs of the occupants. At or about 10:30 P. M. of the 16th of October, 1931, two witnesses living on opposite sides of the apartment at 2929 North Second Street each heard three shots which they identified as pistol shots and located as coming from that apartment. They each looked toward the apartment and saw that it was dark; that there were no lights shining from it. A street-car conductor on the Indian School line traversing Third Street testified that at either 9:40 or 10:25 P. M., on either October 16th or 17th the defendant boarded his car at Third Street and McDowell Road and was let off at the Thomas Road crossing, about three blocks from the apartment at 2929 North Second Street; that returning south he picked her up at the

Thomas Road crossing at 11:25 P. M. and let her off at Willetta Street. A nurse employed at the Grunow Clinic testified that on the morning of October 17th the defendant telephoned to her at the Clinic, endeavoring to imitate the voice of the deceased, and said that she was Mrs. Le Roi and that she would not be at work that day. An employee of a transfer company in Phoenix testified that about 10 minutes of 10 o'clock on the night of October 17th the defendant telephoned to the office of the company and requested him to call at 2929 North Second Street and get a trunk to be taken to the Union Station; that she met him and two other men who accompanied him upon their arrival at that apartment and pointed out the trunk, a heavy "packer" trunk standing on the floor of the front room, which she directed them to transport to the Union Station to go out on the 10:40 train to Los Angeles; that he informed the defendant that the trunk was too heavy to be shipped as baggage, estimating it to weigh about four hundred pounds; that the defendant then directed him to transport the trunk to her "sister's" house at 1130 East Brill Street. This house was in reality the apartment where she herself resided. The trunk was taken to that address by the transfer employees on their truck, the defendant riding with them. On the afternoon of October 18th the defendant's landlord, with the assistance of his son, transported in his automobile, at the request of the defendant, two trunks, one a large "packer" trunk and the other a small "steamer" trunk, a suitcase, a leather grip, and a hat box, together with the defendant, from her apartment at 1130 East Brill Street to the Union Station in Phoenix. At the station the defendant checked the trunks to be shipped to Los Angeles as baggage on the "Golden State Limited" and boarded the chair car of that train, taking with her into the

car the suitcase, the grip, and the hat box. The baggageman on that train noticed an offensive odor coming from one of the trunks and that there was leaking from it what he believed to be blood. Upon arrival of the train at Los Angeles on the morning of October 19th, he immediately notified the Los Angeles baggage agent, who ordered the trunks held. When the defendant left the train at Los Angeles, she had her hand luggage deposited in the ladies' waiting-room, leaving it there and never returning to claim it. About noon of October 19th the defendant came with her brother to claim the trunks. The agent told her that the contents of the trunks would have to be inspected before delivery to her and requested her to open them. Defendant then said that she did not have the keys and would have to phone her husband to bring them down to the station. She was given an opportunity to phone, but reported that she was unable to locate her husband by telephone and would have to go and bring him to the station. The trunk checks were given to her and she departed never to return. An officer from the police department was then called and he opened the trunks. The larger trunk was found to contain the body, intact, of a woman later identified as the deceased, Agnes Ann Le Roi. The smaller trunk contained portions of the body of a woman later identified as Hedvig Samuelson, and the suitcase contained other portions of that body. In the hat box, among other things, was discovered a kit of surgeon's tools, a scalpel, and a 25-caliber automatic pistol. In a purse which had been left with the hand luggage was found one lead bullet and two empty shells. It was later on shown that the automatic pistol removed from the hat box had fired these empty shells and bullet, as well as another bullet afterwards removed from the body of Agnes Ann Le Roi and another shell afterwards

found in the apartment at 1130 East Brill Street. The defendant surrendered to the Los Angeles police on October 24th and was returned to Phoenix.

Upon the trial the state introduced in evidence, counsel for defendant announcing that they had no objection thereto, a certain document or letter which was shown to be in the handwriting of the defendant and written upon postal telegraph blanks. The instrument, State's Exhibit "W," was referred to throughout the trial as the "drain letter," because it was recovered from the drain or soil pipe of a toilet in the Broadway Department Store in Los Angeles by the assistant engineer of the building, whose attention was called to the toilet being clogged. This letter was apparently intended by the defendant for her husband, and contained, besides a recital of certain episodes occurring in her life, an account of events leading up to the killing of the two women and a graphic, if somewhat incoherent, description of what is therein purported to have taken place at the time of the killing. That part of this letter which purports to set forth the events preceding and at the time of the killing is quoted further along in this opinion.

Upon the trial defendant did not take the witness-stand. By far the greater portion of the evidence adduced upon her behalf was to support the defense of insanity which was interposed by the defense. Aside from that, evidence was introduced to corroborate the purported statements contained in the "drain letter" that the killing occurred on the morning of October 17th instead of on the night of October 16th, one witness who lived about five hundred feet southeast of the apartment at 2929 North Second Street testifying that about six o'clock of that morning he heard the screams of a woman coming from that apartment for a period of about five minutes and then heard two shots about five seconds apart.

Also, to corroborate defendant's story that she was shot in the hand during her struggle with Miss Samuelson, four witnesses were produced by the defendant who testified that on Saturday, October 17th, they saw the defendant with her left hand in a bandage. Other witnesses for the defendant testified to the friendly relations apparently existing between her and the deceased immediately prior to the killing.

Twelve assignments of error are presented for consideration, which for convenience will be grouped under five headings, viz.: (1) Assignments Nos. 1 and 2, refusal of the trial court to instruct the jury upon the law of self-defense. (2) Assignment No. 3, denial by the trial court of defendant's motion for a new trial upon the ground that the juror Kleinman was not qualified to sit as a juror. (3) Assignments 4 to 10, inclusive, alleged erroneous instructions upon the law of insanity. (4) Assignment No. 11, the overruling by the trial court of defendant's objections to certain questions propounded to the defendant's witness Dr. Stephens upon cross-examination. (5) Assignment No. 12, alleged error of the trial court in placing limitations at the close of the state's case upon certain evidence introduced by the state with respect to the killing of Hedvig Samuelson.

Assignments of error grouped under heading No. 3 will first be disposed of. By these assignments error is predicated upon the instructions of the trial court on the question of insanity, No. 4 assigning as error the refusal to give defendant's requested instruction No. 10 as follows:

"The term 'insanity,' as used in these instructions means such a perverted and deranged condition of the mental and moral faculties as to render a person incapable of distinguishing between right and wrong, or unconscious at the time of the nature and quality of the act she is charged with having committed, or where though conscious of it and able to distinguish

between right and wrong, *yet her will, by which I mean the governing power of her mind has been so completely destroyed by insanity, that her actions are not subject to it, but are beyond her control.* If, therefore, the accused in this case was at the time of the act insane, as this term has been defined to you, then your verdict should be not guilty, or if you entertain a reasonable doubt as to whether or not the defendant was insane, then you must acquit the defendant.''

By this requested instruction the appellant invokes the so-called ''irresistible impulse'' doctrine. We have italicized that portion of the language of the requested instruction which indicates this. In jurisdictions which recognize this doctrine it is held that notwithstanding the fact that one accused of crime is able to comprehend the nature and quality of his act and to know that it is wrong, nevertheless if he is forced to do it by an impulse which he is unable to control because of an actual disease of the mind, he will be excused. This court has not hitherto recognized this doctrine as the true test of insanity, but on the contrary has adhered to the ''right and wrong'' rule, as laid down in *Foster* v. *State,* 37 Ariz. 281, 294 Pac. 268:

''The presumption of law is that every person charged with crime is sane, and the presumption, therefore, is that the defendant was sane when he committed the act. If a person would avoid the consequences of his act on the ground of his inability to perceive and know such act to be wrong, it is incumbent upon him at least to raise a doubt in the minds of the jury as to his sanity. If the jury believed from the evidence that defendant was sane, the law implies deliberation and premeditation from the circumstances of the killing. The degree of the crime is not dependent upon defendant's intelligence or lack of intelligence, his power to reason or not to reason. If he knew the nature and quality of his act, and that it was wrong, . . . he is amenable to punishment therefor to the same extent as if he

were one whose sanity is not questioned. The law does not discriminate between degrees of intelligence in fixing the penalty.''

And *Lauterio* v. *State,* 23 Ariz. 15, 201 Pac. 91:

''It is not enough that the jury 'entertain a reasonable doubt as to the sound mind of the defendant at the time of the commission of the crime.' They must entertain a reasonable doubt of his ability to distinguish between right and wrong as applied to the act involved.''

Under the heading of ''Irresistible Impulse as an Excuse for Crime,'' in 70 A. L. R., at pages 659 to 684, will be found many cases *pro* and *con* 'this doctrine. Much argument is expended on both sides of the proposition, but we believe that the view taken by those jurisdictions which adhere to the ''right and wrong'' rule, as against the ''irresistible impulse'' doctrine, viz., that one cannot be forced by an irresistible impulse to do an act which he knows to be wrong and the nature and quality of which he is capable of realizing, is the more reasonable one to take and the less likely to lead courts into realms of vagueness and uncertainty which are so characteristic of those inquiries where the less substantial rule has been followed. In 1873 the New York Court of Appeals had this same proposition under consideration, and in disposing of it used the following language, which is so expressive of our ideas upon the subject that we have no hesitation in adopting it:

''We are asked in this case to introduce a new element into the rule of criminal responsibility in cases of alleged insanity, and to hold that the power of choosing right from wrong is as essential to legal responsibility as the capacity of distinguishing between them; and that the absence of the former is consistent with the presence of the latter. The argument proceeds upon the theory that there is a form of insanity in which the faculties are so disordered and deranged that a man, though he perceives the

moral quality of his acts, is unable to control them, and is urged by some mysterious pressure to the commission of acts, the consequences of which he anticipates but cannot avoid. Whatever medical or scientific authority there may be for this view, it has not been accepted by courts of law. The vagueness and uncertainty of the inquiry which would be opened, and the manifest danger of introducing the limitation claimed into the rule of responsibility, in cases of crime, may well cause courts to pause before assenting to it. Indulgence in evil passions weakens the restraining power of the will and conscience; and the rule suggested would be the cover for the commission of crime and its justification. The doctrine that a criminal act may be excused upon the notion of an irresistible impulse to commit it, where the offender has the ability to discover his legal and moral duty in respect to it, has no place in the law." *Flanagan* v. *People,* 52 N. Y. 467, 11 Am. Rep. 731.

The trial court, therefore, committed no error in refusing defendant's requested instruction No. 10.

Under this heading No. 3 appellant assigns as error the use of the word "and" by the trial court in certain instructions upon the question of insanity, where, she says, the word "or" ought to have been employed. On this proposition appellant's contention is that even under the "right and wrong" rule the test of insanity is whether or not the accused, (1) is able to distinguish between right and wrong, and (2) is able to realize the nature and quality of his act; that if he fails in either of these respects he is to be considered insane. Appellant complains that, by the use of the word "and" in its instructions, the trial court required the jury to find that the defendant had failed in both respects before it could find her to be insane. The instruction of the trial court, deleting the parts unnecessary to a consideration of this question, was: "If . . . you are not convinced . . . that the defendant . . . knew that she was doing wrong . . . *and* realized the nature and quality of her act,

then you should return a verdict of not guilty by reason of insanity." We have italicized the word complained of. By this instruction it is clear that if the jury were convinced of one of the conditions but were not convinced of the other, still they are required to return a verdict of not guilty by reason of insanity. The conjunctive was correctly employed; both conditions must be found to exist before the jury can find the accused to be sane. Other instructions of similar import complained of were also correctly phrased in this respect.

All other assignments of error under heading No. 3 are without merit. We have carefully examined the instructions of the trial court in their entirety and find that they fully, completely and correctly state the law with respect to every phase of the case presented by the evidence. It is a well-recognized rule that particular instructions may not be singled out and cited as erroneous, and that each must be considered in relation to the others and effect given to them as a whole. *Macias* v. *State*, 36 Ariz. 140, 283 Pac. 711.

By assignment No. 11 under heading No. 4, appellant complains of the ruling of the trial court in refusing to sustain her objection to a question propounded by the state upon cross-examination of Dr. George W. Stephens, superintendent of the Arizona Hospital for the Insane, one of the defendant's expert witnesses on the question of insanity. Dr. Stephens had previously given testimony covering his experience as a physician in the treatment of the insane and had given his opinion concerning the mental condition of the defendant. Counsel for the state was cross-examining him with respect to his qualifications as an expert on the question of insanity and asked whether or not he had ever taken an examination as to his qualifications to hold the position of superintendent of the Arizona State Hospital. The

question was a proper one upon cross-examination, and the trial court committed no error in overruling the objection interposed to it. Although this was the only objection raised during the entire cross-examination of Dr. Stephens, appellant seeks to have that objection apply to the entire cross-examination of the witness, characterizing it as highly prejudicial and calculated to break down and discredit before the jury Dr. Stephens' entire testimony given in her behalf on direct examination, and urging that the trial court committed error in not interposing between counsel and the witness to protect the latter from such unwarranted abuse. It is of course true that it is the duty of·the trial court, in a proper case, to protect a witness from any abusive or otherwise unwarranted attack by counsel, and to rebuke counsel therefor. But this is a matter within the sound discretion of the trial court, and unless it appear that such discretion has been abused there is no basis for error. We have carefully scrutinized the entire record of Dr. Stephens' cross-examination, and while it is replete with spirited dialogue between the witness and state's counsel, we can find nothing abusive in it, nor anything which could have tended to degrade or discredit him before the jury. In fact, we were impressed with the witness' ability to take care of himself to the extent that it was entirely unnecessary for the trial court to interfere in his behalf. No error was committed by the trial court in overruling the objection or in failing to rebuke counsel upon the cross-examination of this witness.

Assignment of error No. 12 under heading No. 5: At the conclusion of the state's case the trial court, in order to clarify the situation before the jury, placed limitations upon certain evidence introduced by the state with respect to the killing of Hedvig Samuelson, whose dead body was found in the baggage of the defendant along with that of the de-

ceased for whose murder defendant was being tried. The language used by the trial court was as follows:

"Gentlemen, at this time the Court instructs you that the defendant in this case is charged with the murder of Agnes Ann Le Roi. She is not charged with the killing of Hedvig Samuelson or any other person. You are further instructed, gentlemen, that some evidence has been admitted and permitted to go to you, in which the State attempts to show the killing of another person, to-wit, one Hedvig Samuelson, a person other than the one with which the defendant is charged with murdering. In this connection, gentlemen, you are instructed that the defendant is not on trial for the killing of Hedvig Samuelson. You are therefore further instructed, gentlemen, that any evidence tending to show the killing of Hedvig Samuelson, if you do so consider it, was introduced by the State for the purpose of proving the intent, motive, common scheme or plan, or identity of the defendant. And the Court further instructs you, gentlemen, that you may consider such evidence if you see fit, for those purposes, or any one of them, and for no other purpose or purposes."

In complaining of this instruction, appellant says:

"This instruction became purely an instruction for the State, given as it was at the close of the State's direct case, and called to the attention of the jury that in the commission of the crime against Agnes Ann Le Roi there was an intent, motive, common scheme or plan or identity of the defendant."

We do not think this instruction is susceptible of the interpretation thus placed upon it by appellant. The record discloses that throughout the entire presentation of the state's case objections were constantly being made by defendant's counsel to the introduction of any evidence with respect to the killing of Hedvig Samuelson on the ground that it was incompetent as evidence against the defendant upon the charge of murdering Agnes Ann Le Roi, and that the court overruled each specific objection without

placing any limitation upon the reception of such evidence. Had the trial court not given the instruction complained of, doubtless appellant would now be here urging the previous objections so made. The trial court in giving it was but following the well-recognized rule with respect to evidence of this character, as laid down by this court in *Dorsey* v. *State*, 25 Ariz. 139, 213 Pac. 1011:

"The general rule is that, in the prosecution of one accused of a particular offense, evidence showing or tending to show the commission by accused of another crime entirely distinct and independent of that for which he is on trial, even though it be a crime of the same class, is neither relevant nor admissible. . . .

"To this general rule, however, there are certain well-recognized exceptions, in which evidence of other crimes is competent to prove the specific crime charged. This is true when it tends to establish: (1) Motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes, so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial. *Crowell* v. *State, supra* [15 Ariz. 66, 136 Pac. 279]; *People* v. *Molineux,* 168 N. Y. 264, 62 L. R. A. 193, 61 N. E. 286."

This instruction fully covered the situation, and we find no error in it.

Assignment of error No. 3 under heading No. 2: Upon her motion for a new trial the defendant challenged the right of the juror Kleinman to sit as a juror in the case on the ground that he was biased and prejudiced against her from the time he entered the jury-box, and that it was impossible for him to give her a fair and impartial trial. She assigns as error the refusal of the trial court to grant her a new trial on this ground. An examination of the record discloses that if there was any such bias and

prejudice it was not disclosed until after the termination of the trial, although upon the *voir dire* examination of the juror, defendant had full opportunity to discover the state of his mind; and that the juror answered fully and freely and without any attempt at concealment all the questions which were propounded to him by counsel, admitting that he had theretofore entertained and expressed an opinion concerning the case, but that it was not a fixed opinion and that he could and would set it aside; notwithstanding which defendant accepted him as a juror. Upon the hearing of the motion for a new trial defendant presented the affidavits of A. E. Parmer and Burton H. Ward, who deposed that they heard the juror, each at different times previous to the trial, express himself of the opinion that the defendant was guilty and ought to be hanged. Affidavits controverting these affidavits were filed by the state, and oral evidence was taken upon both sides, after which the trial court denied the motion. Appellant concedes that the determination of the trial court is final in the absence of abuse of discretion, but urges that the record discloses an abuse of discretion.

After a careful review of all the evidence taken upon this hearing and of the *voir dire* examination of the juror Kleinman and of the venireman Burton H. Ward, who made one of the affidavits for the defendant, we are unable to find any abuse of discretion in this respect on the part of the trial court. Kleinman emphatically denied that he had made the statements attributed to him by Parmer and Ward. Upon his *voir dire* examination Ward, in answer to the question, "Have you heard anyone discuss this case?" answered, "No, sir, not to amount to anything." It seems incredible that if he had heard Kleinman say the defendant was guilty and ought to be hanged, he would not then have remembered it or that he could have considered it as "not amounting to anything."

The state produced a witness who testified that he was present at the time Parmer testified he had his conversation with Kleinman and that no such statement was made by the· latter.

The rule that such a question is addressed to the sound discretion of the trial court is well settled (*Johnson* v. *State,* 33 Ariz. 354, 264 Pac. 1083), and as the record discloses no such abuse, no error was committed in denying the motion for a new trial.

Assignments of error Nos. 1 and 2, heading No. 1, are predicated on the refusal of the trial court to instruct the jury upon the law of self-defense.

It will be remembered that the defendant did not take the witness-stand in her own behalf, and further that there was no direct evidence on either side of the facts of the killing, there being no eye-witness of it. The so-called "drain letter" is the only piece of evidence purporting to contain an account of the attending circumstances. This letter was offered in evidence by the state, and admitted without objection on the part of the defendant, as an admission tending to prove the defendant's guilt of the crime charged. We have set forth further along those portions of this exhibit which are pertinent to the question raised by these assignments. It will be observed therefrom that the defendant related the circumstances which she doubtless wished to have believed led up to and surrounded the killing of the two women. Appellant urges that if those facts so related in any manner tend to show that the killing of Agnes Ann Le Roi was done in self-defense, the jury ought to have been instructed upon that phase of the law. Further appellant argues that regardless of whether or not the "drain letter" contains evidence of self-defense, inasmuch as this exhibit was introduced by the state and not by the defendant, and as the evidence in the case was entirely circumstantial, there being no eye-witnesses to the killing, she was entitled

to have instructions on all phases of the law including self-defense, and cites authorities to sustain that contention, viz.: *State* v. *Truskett,* 85 Kan. 804, 118 Pac. 1047; *Messer* v. *Commonwealth,* 90 S. W. 955, 28 Ky. L. Rep. 920; *Rutherford* v. *Commonwealth,* 76 Ky. (13 Bush) 608. These cases sustain appellant's contention in this respect, laying down the rule in homicide cases that where the evidence is entirely circumstantial, there being no eye-witness to the killing, and the defendant not taking the stand and testifying to the facts surrounding the killing, the jury is to be instructed fully and completely upon all phases of the law, including that of self-defense, in order that they may not be restricted in their prerogative of fully, freely, and completely determining the facts in the case and drawing therefrom such inferences and conclusions as they see fit, and may be as free to arrive at a verdict of not guilty as to determine the contrary. So far as we have been able to ascertain from an examination of authorities, Kentucky and Kansas are the only two jurisdictions which have adopted this rule. This court has not heretofore had occasion to pass directly upon this question in any case where the evidence of the killing was entirely circumstantial, the defendant not taking the stand and testifying in his own behalf. However, the rule has frequently been enunciated that "instructions must be based upon some theory of the case which may be found in the evidence, and, when not so predicated, they should not be given, as their tendency would be to mislead the jury." *Macias* v. *State, supra.* Also *Foster* v. *State, supra; Singh* v. *State,* 35 Ariz. 432, 280 Pac. 672, 67 A. L. R. 129; *Campbell* v. *Territory,* 14 Ariz. 109, 125 Pac. 717; *Hicklin* v. *Territory,* 9 Ariz. 184, 80 Pac. 340. This is the rule prevailing in most of the states of the Union, and it is without doubt better grounded in reason and logic than the one contended for by appellant, supported by the

courts of Kansas and Kentucky alone. What sound reason can exist for instructing the jury upon the law of self-defense when there is no evidence of facts and circumstances tending to prove it? Of course, if the evidence, circumstantial though it may be, in the slightest degree tends to indicate that the killing was done in self-defense, an instruction upon that phase of the law should be given. But if it does not, to give such an instruction could not in any manner aid the jury in its determination of the ultimate fact to be by them ascertained, and could accomplish nothing but their confusion. It is incumbent upon the State in every case to prove the accused guilty of the crime charged against him, and if in attempting to do so evidence is adduced which in any manner indicates that the killing might have been excusable or justifiable, the accused is to be given the benefit of it under proper instructions. Nevertheless it is recognized that self-defense is an affirmative plea available to the accused, and while he may not be required to take the stand in his own behalf, full opportunity is afforded him to do so if he sees fit, and to present to the jury in the light most favorable to him the circumstances surrounding the killing, if he desires to interpose this plea. If he declines to admit the killing either by directly denying it upon the stand, or by refusing to testify at all, we can see no sound reason for injecting into the case a question which has no support in the issues or evidence.

The evidence in this case, aside from the "drain letter," sheds no light upon the actual facts and circumstances attending the killing of these two women, except what may legitimately be inferred from the testimony of the autopsy surgeon at Los Angeles who testified as to the wounds found upon their dead bodies resulting in their deaths. Each of these women was killed by a bullet wound in the head, the

pistol discharging the bullet in each instance being held in close contact with the head of the victim. One of the women had been wounded in the hand and breast by a bullet fired either before or after the firing of the fatal shot. This is the mute evidence of what took place in the apartment at 2929 North Second Street on the night of October 16th, and is corroborated by the two witnesses who heard three shots fired in that apartment at about 10:30 that night. No evidence whatever of any struggle having taken place. No screams or outcries of any kind. Three shots fired in a dark house at dead of night; two women dead of gunshot wounds fired from a weapon held in close contact with their respective heads. No slightest evidence of self-defense on the part of the perpetrator of the deed.

The "drain letter" contains the defendant's version of the killing. It was introduced by the state as an admission of guilt by the defendant. Nevertheless the defendant is entitled to the benefit of whatever it may contain in support of her claim now urged upon this appeal and upon her motion for a new trial before the lower court, that the killing was done in self-defense. The learned trial judge held that this letter did not afford any basis for the giving of an instruction upon the law of self-defense. That portion of the exhibit which has any bearing upon this assignment of error reads as follows:

"Mr. H came out the next evening to see Sammie and me. . . . Mr. H. wanted me to get some other girl and go with him out to the house I knew a pretty little nurse who is taking Salvarsan but she has nothing contagious now. I certainly am not expecting them to do wrong, anyhow, so saw no harm she's pretty and can be interesting so we went out to the girl's house. Dr. Brinkerhoff and a couple of Mr. H. friends were there. The girls didn't like it so Mr. H. asked us to have dinner with them I refused to so he got dinner and came over to the house. . . .

Next day Ann came over and we had lunch together the remains of the dinner the night before. She wanted me to go home with her that night. Evelyn Nace was going. I had some histories to do and couldn't. I said if I get through in time I'll come over and play bridge. Evelyn left early and we didn't play bridge, but I stayed all night. The next morning all three of us were yet in our pajamas when the quarrel began I was going hunting. They said if I did they would tell Mr. H. I had introduced him to a nurse who had syphillis. I said Ann you've no right to tell things from the office you know that only because you saw me get distilled water and syringes ready and she hasn't it contagious the doctor lets her work nursing. Well Ann said I asked Evelyn and she thinks I should tell Mr. H. too. And he certainly won't think much of you doing such a thing. You've been trying to make him like you and Mr. D too, getting him to move you and when I tell them you associate with and introduce them to girls who have syphillis they won't have a thing to do with you. And when we tell Mr. P. about it he won't take you hunting either. I said Sammy I'll shoot you if tell that. *We were in the kitchen just starting breakfast. She came in with my gun and said she would shoot me if I went hunting with this friend. I threw my hand over the mouth of the gun and grabbed the bread knife she shot* I jumped on her with all my weight and knocked her down in the dining-room. Ann yelled at us I fired twice I think and since Ann was going to black mail me too if I went hunting by telling them this patient of Dr. Baldwin's was syphilitic and would hand me over to the police, I fired at her. There was no harm introducing this nurse who is very pretty to the men. One doesn't get it from contact but *they were going to kill me* for introducing this her initials are L. M. St. Josephs to their men friends. *Ann said before Sammy got the gun Ruth I could kill you for introducing that girl to ? ? ?* and if you go hunting I will tell them and they won't think your so darn nice anymore. . . . *Mr. D. kept Ann in an apartment here in L. A. for several days then got her stateroom to Ph and she was mad enough to kill me when he*

*helped move me over. . . . Doctor dear Im so sorry Sammy shot me whether it was the pain or what I got the gun and killed her. . . . Doctor, darling if I hadn't got the gun from Sammy she would have shot me again. . . .* It was as much a battle as Germany and the U. S. *I killed in defense."*

We have italicized the portions of the language quoted which appellant relies upon to support her argument upon this proposition. That these isolated phrases and sentences, by themselves or taken together, do not afford any support for a plea of self-defense in the killing of the deceased Agnes Ann Le Roi, for the murder of whom the defendant was being tried, is apparent, and when taken in connection with other language quoted, viz., "and since Ann was going to black mail me too if I went hunting by telling them this patient of Dr. Baldwin's was syphilitic and would hand me over to the police, I fired at her," conclusively refutes any such argument.

No error was committed by the trial court in declining to instruct the jury upon the law of self-defense.

The judgment of the lower court is affirmed.

ROSS and LOCKWOOD, JJ., concur.

McALISTER, C. J., being unable by reason of illness to be present upon this hearing JOSEPH S. JENCKES, Judge of the Superior Court of Maricopa County, was called in to sit in his stead.