[Criminal No. 220.    Filed March 30, 1905.]

[80 Pac. 340.]

FRED HICKLIN, Defendant and Appellant, v. TERRI-
TORY OF ARIZONA, Plaintiff and Respondent.

1. CRIMINAL LAW—HOMICIDE—SELF-DEFENSE—REV. STATS. ARIZ. 1901,
PEN. CODE, SECS. 181, 182, CONSTRUED.—Sections 181 and 182, *supra*,
provide that "A homicide is justifiable when committed in the law-
ful defense of such person, . . . when there is reasonable ground to
apprehend a design . . . to do some great bodily injury, and immi-
nent danger of such design being accomplished. But such person
. . . if he was the assailant . . . must really and in good faith
have endeavored to decline any further struggle before the homicide
was committed. A bare fear of the commission of the offenses, . . .
to prevent which the homicide may be lawfully committed, is not
sufficient to justify it, but the circumstances must be sufficient to
excite the fears of a reasonable person, and the party killing must
have acted under the influence of such fears alone." Under these
sections, the testimony of the defendant that after his sister had
told him of an insult offered her by deceased he saw him coming
down the road, and, picking up a gun, walked down the road towards
him, and turning brought the gun up and said, "What did you
insult my sister for?" to which deceased did not reply for ten or
fifteen seconds, when he saw deceased jerk his hand, and thinking
he was going for his gun, being angry and excited, he pressed the
trigger and fired, did not present the issue of self-defense.

2. SAME—SAME—SAME—INSTRUCTION TO JURY—MATTER OF LAW—NOT
CRITICISM OF DEFENDANT'S CREDIBILITY.—Where on a trial for
murder the facts as given in defendant's statement taken as true
did not constitute self-defense as a matter of law, it is the duty of
the court to eliminate that feature from the case, and an instruc-
tion that "I charge you . . . under the facts and circumstances
shown in the evidence, there is nothing shown to justify, under the
law, the killing of Mullino by the defendant," was not erroneous as
a criticism upon defendant's testimony.

3. SAME—SAME—EVIDENCE—IMPEACHMENT.—Where a witness takes the
stand for the defense in a prosecution for homicide, it is permissible
for the prosecution to impeach her by her own cross-examination, in
contradiction of her direct testimony, and by the introduction of
other competent evidence affecting her credibility.

4. SAME—SAME—MANSLAUGHTER—INSTRUCTION TO JURY.—In a prose-
cution for homicide an abstract declaration of the law by the court
in charging the jury, that "The law does not permit the taking of
human life in rage or passion occasioned by inadequate provocation,

—that is, by slight or trivial provocation,—but it must be such as would, in the mind of an average man, be calculated naturally to arouse such rage and passion as would render the mind uncontrollable in its impulses to take life,'' was not prejudicial, where the court further and fully charged the jury on the reduction of murder to manslaughter, and, in addition thereto, the law relative to manslaughter was fully given in language chosen by the counsel for defendant.

APPEAL from a judgment of the District Court of the Fourth Judicial District in and for the County of Yavapai. Richard E. Sloan, Judge. Affirmed.

The facts are stated in the opinion.

Hawkins, Ross & Anderson, for Appellant.

Joseph H. Kibbey, Attorney-General, for Respondent.

DOAN, J.—On Wednesday, the twenty-second day of June, 1904, Florence Hicklin, the nineteen-year-old sister of appellant, was visiting at the Marksberry home, at Dewey, Yavapai County, Arizona. During her visit she was some time in the company of Jud Mullino, whom she had known for a short time, and who had been paying her some attention' theretofore. Upon Thursday she returned to her home, at Blanchard, a few miles distant, arriving there about noon. Just after dinner on Friday, in the presence of the Hicklin family, she told of an insult offered to her by Jud Mullino on Wednesday evening, when she and Mullino had walked out together some distance from the Marksberry home. Among the men of the Hicklin family who heard this recital was the appellant herein, · Fred Hicklin, who had returned home the previous day from California, whither he had gone to secure medical treatment for a nervous affection ·which had resulted from an injury to his head and spine, received by him some months before. He was unacquainted with Jud Mullino, and at that time was in poor health, mentally and physically. He remained about the Hicklin house from the time of the aforesaid recital by his sister until about five o'clock in the afternoon, when he overheard his sister say that ''Mullino was coming down the road toward the house.'' He picked up a Winchester rifle, went out of the back door of the house, and, walking in the direc-

tion in which Mullino and two other companions—Frank Armor and Frank Rahl—were riding on horseback, proceeded nearly parallel with the road until he was within a few steps of the parties, and a little in advance of them, when he turned and faced Mullino and his companions as they came riding down the road, presented the gun and fired, and Mullino fell from his horse. The deceased was riding in his shirt-sleeves, with a loose vest on, and no coat. He was wearing a pair of riding gauntlet gloves on his hands at the time. The bullet went through the side pocket of his vest, entered the left breast, passed directly through the heart and came out behind. As to the details of the occurrence, Armor testified: "We were riding along three abreast. The man that was killed was on the outside. This defendant threw the gun to his shoulder, never spoke a word, and fired. I didn't notice what had happened until I looked at my partner, when I saw him reel in the saddle. I was riding on the left, next to the man that did the killing of Mullino; Frank Rahl was in the center; and Mullino was standing in his stirrups on one side, like— kind of riding on one leg—laughing, as the shot struck him." Frank Rahl, the party riding next to Mullino, testified: "As we were riding up, I noticed Mr. Fred Hicklin coming up with a gun on his shoulder at about twenty or thirty steps from the road. He walked on with the gun on his shoulder, and then wheeled and shot Mullino off his horse. He walked along about fifty or sixty steps in that way before he shot. He was about twenty steps from Mullino when he fired the shot. When the gun was thrown down on us, I raised my hands, and so did Mullino. The gun was fired, and he fell from his horse, dead. Nothing was said, that I heard, either by defendant or Mullino." The defendant was thereafter indicted, in conjunction with Florence Hicklin and J. H. Hicklin, for murder, to which indictment he pleaded not guilty; and the trial was had thereunder, resulting in the conviction of appellant of the crime of murder in the second degree. A motion for a new trial was denied, and judgment rendered in accordance with the verdict. From the judgment and the denial of the motion for a new trial an appeal was taken.

Upon the trial of this cause the appellant offered three separate defenses: 1. That he was insane at the time of the killing, and could not be held responsible therefor. This de-

fense was properly presented to the jury by the introduction
of proof, and by the instructions of the court, and concerning
which no error is alleged on this appeal.   2. That the killing
was done in self-defense, for which reason appellant could
not be punished therefor.   This defense was excluded from
the consideration of the jury by the court upon the ground
that there was no evidence upon which to base it, which is
claimed by the appellant to have been prejudicial error.
3. That the killing was done under a sudden heat of passion
adduced by adequate provocation, and the appellant could
not be convicted of any higher grade of offense than that of
manslaughter.   It was claimed by the appellant that this
defense was greatly weakened by an instruction of the court
given on the subject of manslaughter, and this is assigned as
error.

In support of his first assignment of error, "that the theory
of self-defense was excluded from the consideration of the
jury by the court," it is urged by the appellant in his brief
that the plain implication of the charge given by the court
on that subject was that the appellant had offered a manu-
factured defense, and that his testimony was not to be con-
sidered; that the instruction actually given by the court
directly criticised appellant's credibility as a witness,
and "was an instruction on the weight and credibility of testi-
mony."   An examination of the instruction complained of,
and of the testimony of the defendant, does not sustain that
contention.   The court instructed the jury:   "I charge you
further in this case, under the facts and circumstances shown
in the evidence, that there is nothing shown to justify, under
the law, or to excuse, under the law, the killing of Mullino
by the defendant."   We pass by the testimony of the two
parties who were riding with the deceased at the time of the
killing, because, in presenting the case to the jury, it is prop-
er that the court should present it in the light of the testi-
mony of the defendant.   We will therefore take the case as
made by the defendant's own testimony, because the theory of
self-defense, as stated by the counsel for the appellant, was
supported only by the testimony of the defendant.   His two
versions of the occurrence were given in these words:   "I
stepped back into the room and picked up the gun, and walked
off down the side of the road; and, when I got down there,

these fellows were riding down behind me. I turned around and I asked him, 'What did you insult my sister for?' He did n't answer. I saw him make a move as if he was going after a gun. I was so mad and excited that I was almost shot to pieces. I pressed the trigger and shot." His other statement is worded: "When he came riding down the road (I never seen him before), my sister says, 'There comes Jud Mullino now.' I picked up the gun where it was sitting, and I went off down the road there, and I turned and I says, 'What did you insult my sister for?' He didn't say anything. I saw him jerk his hands as though going for a gun. I was so excited and angry that I pressed the trigger and fired." On cross-examination defendant said: "He was riding on his horse. I was down and to the left of him. As I turned I brought the gun up, and I says, 'What did you insult my sister for?' It must have been ten or fifteen seconds he did n't say a word—did n't answer me. I saw his hand jerk something like this [indicating]. I thinks to myself, 'He is going for a gun.' It was told to me that he said he packed a gun as big as any of us packed, and I ·did n't want to take any chances; and, of course, the other thing happened." It is the undisputed testimony in the case that, at the crack of the gun, deceased fell from his horse, shot directly through the heart.

Our statute on self-defense (Rev. Stats. 1901, pars. 181, 182) says: "A homicide is justifiable when committed in the lawful defense of such person . . . when there is reasonable ground to apprehend a design . . . to do some great bodily injury, and imminent danger of such design being accomplished. But such person . . . if he was the assailant . . . must really and in good faith have endeavored to decline any further struggle before the homicide was committed. A bare fear of the commission of any of the offenses . . . to prevent which homicide may be lawfully committed, is not sufficient to justify it, but the circumstances must be sufficient to excite the fears of a reasonable person and the party killing must have acted under the influence of such fears alone." The instruction of the court cannot be logically considered as a reflection on the testimony of the defendant, or a criticism of his credibility as a witness. But it is equivalent to saying that the facts as testified to by the defendant were not sufficient

to constitute a ground for self-defense, under the requirements of the law. Counsel for the appellant seems to have overlooked two important provisions of the statute cited above. One is that, if the slayer is the assailant, he must really and in good faith have endeavored to decline any further struggle before the homicide was committed. There is no evidence that such was the case in this instance. In fact, the testimony of the defendant is directly to the contrary. A further requirement is that "the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone." There is not a word in the evidence of the defendant stating or intimating that he felt any fear, or that his act was in any way or to any extent influenced by fear; but he says in the one recital: "I was so mad and excited that I was almost shot to pieces. I pressed the trigger and shot." In another he says: "I saw him jerk his hands as though going for a gun. I was so excited and angry that I pressed the trigger and fired." And in the third: "As I turned, I brought the gun up, and I says: . . . It must have been ten or fifteen seconds he didn't say a word—didn't answer me. I saw his hand jerk," etc. His own language—especially this last statement that he had aimed his weapon at the heart of the deceased, with his finger on the trigger, ten or fifteen seconds before he saw any movement of the hand—shows that he was not within the provisions of the law relative to self-defense; and the instructions of the court cannot be considered as any reflection upon his veracity or any criticism upon his testimony, further than to state, as a legal proposition, that, considering his testimony as absolutely true, the facts it established did not constitute grounds for self-defense, under our statute. Had there been any evidence tending to prove that the killing was done in self-defense, it would have been incumbent upon the court to submit the matter to the jury, in order that they should pass upon the weight and effect of such evidence. But where the facts in support of which testimony is offered would, if taken as proven, not constitute self-defense, it becomes a question of law (25 Am. & Eng. Ency. of Law, 2d ed., 284), and it is the province of the court to eliminate that feature from the case.

The cases cited by the appellant in support of the right of the defendant to arm himself before meeting the deceased, for the purpose of his own protection, because of his knowledge or belief that the deceased was in the habit of going armed, are not applicable to the case at bar. Those are cases wherein the defendant, having armed himself for the purpose of his own protection, claimed to have committed the act, impelled by fear of injury to himself, unless he secured his own safety by slaying his adversary. If in this instance the defendant, although armed, had approached the deceased, had entered into a discussion, or initiated an altercation, and afterwards had drawn his weapon after the drawing of a weapon by the deceased, or an effort on the part of the deceased to draw a weapon, and had claimed in his testimony to have slain deceased, actuated by the fear that unless he did the deceased would have slain him, we would have a much different case presented than this, wherein the defendant testifies that, at the instant of the movement of the hand of deceased, he pressed the trigger, actuated by anger and excitement, without any claim that he was actuated by fear, and wherein the defendant's weapon at the time of the movement, if one was made, had been, by defendant's own testimony, for ten or fifteen seconds presented with deadly aim at the heart of the deceased.

It is assigned as error that the court permitted Florence Hicklin, on cross-examination, to answer some questions that were excepted to, and that the court likewise erred in permitting the introduction of the evidence of Miss Marksberry in rebuttal to some of the testimony offered by Florence Hicklin in her direct and cross-examination. The record discloses that the witness Florence Hicklin was introduced by the defense to corroborate three or four other witnesses in their testimony that she (Florence Hicklin) had had a certain conversation with the defendant on the day of the homicide, shortly after noon; and in her direct testimony she not only testified that she had made certain statements in that conversation, but she also testified to the facts as they occurred on the Wednesday night previous, and likewise testified that she had narrated these facts to the Marksberry girls on Wednesday night after their occurrence. The prosecution was entitled to impeach her by her own cross-examination in contradiction

of her direct testimony, and by the introduction of any other competent evidence that might affect her credibility as a witness, and thus lessen the weight of her testimony in corroboration of the other evidence in support of which it was offered. The examination of the two witnesses named does not seem to have been extended beyond the limit to which the prosecution was entitled to go for this purpose. Owing to the peculiar nature of this case, it was perhaps unfortunate that the effect of this testimony might be prejudicial to the defendant; but for that fact the defense is responsible, in having placed Florence Hicklin upon the stand, and thus opened a way for her legitimate cross-examination and impeachment, from which these other results would incidentally follow.

It is urged by the appellant that the court erred in instructing the jury upon the crime of manslaughter. The expression to which exception was taken reads: ''The law does not permit the taking of human life in rage or passion occasioned by inadequate provocation—that is, by slight or trivial provocation—but it must be such as would, in the mind of an average man, be calculated naturally to arouse such rage and passion as would render the mind uncontrollable in its impulses to take life.'' In the abstract, that is a correct declaration of the law, and, while its incorporation in the definition of the provocation necessary to reduce homicide from murder to manslaughter might be criticised, the court did not stop here, but went further, and charged the jury fully on this subject. It is proper, in passing upon this question, to consider the instruction as a whole, and a careful reading of the entire instruction given in this case convinces us that the law touching the crime of manslaughter was not only correctly, but was fairly and plainly, enunciated by the court in the charge given on its own motion, and, in addition thereto, the law relative to manslaughter was given *in extenso*, in language chosen by the counsel for the appellant. The charge of the court, considered in the light of the authorities cited by the appellant, does not disclose any error that would warrant a reversal.

The judgment is affirmed.

KENT, C. J., and DAVIS, J., concur.