[No. 3137.  Aug. 30, 1927.  Rehearing Denied April 19, 1928.]

STATE v. BUCK.

[266 Pac. 917.]

R. A. Prentice, of Tucumcari, for appellant.

Fred. E. Wilson, Atty. Gen., and James N. Bujac, Asst. Atty. Gen., for the State.

OPINION OF THE COURT

WATSON, J.  ▮  Joe Buck was convicted of assault with a deadly weapon upon Johnnie Buck, his wife.

At about 7:30 on the evening of the day in question Mrs. Buck appeared at the home of a neighbor, on business, clothed and in a normal condition. At about 9 o'clock she appeared at the home of Mr. and Mrs. Dibble, crying and asking to be taken in. She was clothed only with a bathrobe, two stockings, and one shoe. She had been beaten about the head with some blunt instrument, and was in a pitiable condition. According to the physician's testimony, there were thirteen wounds upon the head, five of which he called "large wounds." The left cheek and eye were badly bruised. There was a distinct fracture of the skull back of the left ear, and a slight displacement of the skull behind the other ear. The entire left side of the face was a pulpy mass, and hair and dirt were embedded in the wounds. From the injuries received, the physician testified that there would probably have resulted some period of unconsciousness. On being asked by Mr. Dibble what was the matter, she replied, as testified by Dibble, "that Joe beat her with a six shooter," and, as testified by Mrs. Dibble, "Joe beat me up with a revolver." At about 12:30 o'clock the same night, at the hospital, she told the physician, after saying that her husband had beaten her, "he used a large pistol, knocked me down, and set straddle of me and beat me with the butt end of the gun."

The Dibbles lived some two miles from the Bucks and were the nearest neighbors in that direction, and Mrs. Buck's footprints showed that she had come directly there from a place near the Buck residence. Deputy sheriffs, having been informed, found Buck in his home about 4 o'clock the next morning, where he had evidently been in bed. There was blood on his person and blood on garments (both men's and women's) found on the floor.

The first witness for the state was Mrs. Dunn, who testified to Mrs. Buck's being at her house at a little before 7:30. The physician then testified to the injuries and his treatment, and to Mrs. Buck's declaration as to the cause. The declaration, however, was objected to, was stated in the absence of the jury, and was not received. Mrs. Buck was then placed on the stand. She answered

a few preliminary questions, and admitted that she had been at the home of Mrs. Dunn at about the time mentioned. Asked whether later that night she was at the Dibble home, how dressed when she arrived there, and her condition as to being wounded at the time, she answered, "I don't remember." Asked how she got from Mrs. Dunn's back to her home, she said, "I refuse to answer any more questions." Thereupon the jury retired. Examination proceeded before the court, and, being advised that she was a competent witness, and that her refusal to testify was a contempt of court, she continued to refuse to answer questions, finally saying, "I don't know any facts against my husband, and I refuse to answer any more questions pertaining to my husband." And, again: "I will not testify against my husband because we have lived together five years, and have never had any trouble and never will, and I will always stick by him because he loves me and I love him." The court thereupon adjudged her in contempt. It was after this occurrence and this refusal of Mrs. Buck to testify that the court admitted her declaration made to Mr. and Mrs. Dibble, over the objection that such declaration was hearsay. The reception of that evidence presents the most important question upon this appeal.

The state invokes the exception to the hearsay rule commonly referred to in the decisions as the rule of res gestæ. The exposition of that exception Dean Wigmore says he approached "with a feeling akin to despair," such has been the confusion in its application. The particular principle involved here is that an utterance made impulsively and under the strain and immediate influence of an exciting or terrifying occurrence may be so inherently truthful that the ordinary sanctions and tests may be dispensed with. It is a sound doctrine, and one easily grasped. The difficulty is in its application. What are the tests of spontaneity? Wigmore, after examination of the judicial expositions, admits but three legitimate limitations to the doctrine. They are:

First. "There must be some shock, startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting."

Second. "The utterance must have been before there has been time to contrive and misrepresent, i. e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance."

Third. "The utterance must relate to the circumstances of the occurrence preceding it."

As to the time limitation, he remarks that it is in practice the subject of most of the rulings. Wigmore on Evidence, § 1750.

It is the lapse of time that was made the basis of the objection to the evidence when it was received, and it is the point made here. How much time had passed, as measured by the clock, we cannot tell. Perhaps there was a period of unconsciousness. That would not count. At least the victim had walked two miles from the scene. Wigmore lays it down that:

"There can be no definite and fixed limit of time. Each case must depend upon its own circumstances." Evidence (2d Ed.) § 1750.

Jones says:

"Admissibility depends more on circumstances than on time." Comm. on Evid. (2d Ed.) § 1197.

Wharton says:

"Nor are there any limits of time within which the res gestæ can be arbitrarily confined. They vary in fact with each particular case." Crim. Evid. (10th Ed.) § 262.

It would be an endless task to examine the innumerable decisions dealing with this question. Wigmore warns us that it would be profitless; going so far as to say:

"Since the application of the principle thus depends entirely on the circumstances of each case, it is therefore impossible to regard rulings upon this limitation as having in strictness the force of precedents. To argue from one case to another on this question of 'time to devise or contrive' is to trifle with principle and to cumber the records with unnecessary and unprofitable quibbles. There is a lamentable waste of time by Supreme Courts in here attempting either to create or to respect precedents. Instead of struggling weakly for the impossible, they should decisively insist that every case be treated upon its own circumstances. They should, if they are able, lift themselves sensibly to the even greater height of leaving the application of the principle absolutely to the determination of the trial court. Until such a beneficent result is reached, the lucubrations of Supreme Courts over the details of

each case will continue to multiply the tedious reading of the profession."

We need not dwell or enlarge upon the facts as above stated, to satisfy ourselves that Mrs. Buck had received a great shock, which must have produced a state of nervous excitement, and would, in all experience, for a time, make her utterance spontaneous and unreflecting. Did those results, or would they naturally, continue during her two-mile flight from home in search of succor? There was time, it is true, for reflection; time to appraise her situation; time to consult self-interest and determine upon a course of conduct. What thoughts and emotions engaged her we can only surmise. Pain, resentment, humiliation, grief, outraged feelings; all must have had their influence. It is greatly to be doubted if she was capable of coherent thought, connected reasoning, or deliberate utterance. From such considerations the courts must usually pass upon the admissibility of the utterance. But in this case we need not. The rule of "spontaneous exclamations," as Wigmore names it, or of "spontaneous utterances under stress," as Jones terms it, is ordinarily invoked where the declarant has since died, or to corroborate the declarant's testimony given at the trial. In such cases great caution is to be exercised. The danger of admitting merely self-serving declarations, or those prompted by revenge, must be guarded against. There is no test of spontaneity except the circumstances of the utterance.

This case is different. We may compare the spontaneous utterance with the attitude of the declarant after her emotions had subsided and her reason cleared. Mrs. Buck, a competent witness against her husband, was available and was produced. While for a time she professed not to remember the occurrences, she finally made it plain that she refused to testify against her husband because of affection for him. She adhered to this, even in the face of an adjudication of contempt. It was after and because of this refusal that the state tendered, and the court received, her previous declaration. Counsel cite no such case as this; text-writers discuss no such situation; and no precedent has been brought to our attention. It may be admitted that there was time for reflection. It satis-

factorily appears, however, that there had not been time to consider results, to weigh resentment against wifely affection, and to decide whether she desired to punish her husband or to protect him. After deliberation, she prefers punishment for herself to punishment for him. Her present attitude is proof of the spontaneity and impulsiveness of her former utterance; proof that it was disserving and true. Under the immediate influence of a horrible experience, it was her outraged feelings, her physical and mental distress, her desolate and forlorn condition, that spoke. They spoke the truth. The name of her assailant was not asked. The question was, "What is the matter?" Yet there rushed to her lips the fact uppermost in her mind, the grievous fact, that it was her husband who had beaten her. But after reflection and deliberation, conjugal affection has resumed its sway and has overcome resentment. Self-interest has again asserted itself. She would now repudiate the declaration and withdraw it if she could. This feature of the case is to our minds convincing and controls our decision. We think the learned judge rightly admitted the evidence.

The bloody clothing found in the house was properly admitted in evidence. It was one of the links connecting appellant with the crime, and honestly served to explain the transaction. State v. Romero, 24 N. M. 351, 171 P. 787. True, the deputies did not take it with them when they took appellant into custody, and it was left in the house for several hours. They found it there, however, at the time, and there was sufficient evidence that it remained in the same condition as when discovered.

A motion for change of venue was overruled. The paper showing was in conformity with Code 1915, § 5573. The compurgators were orally examined, however, and the court doubtless considered that their knowledge of conditions throughout the county was not sufficient to support their expressed belief. Such is the established practice in this jurisdiction; and the decision of the trial judge as to the interest and the knowledge of the compurgators is not to be disturbed, unless unsupported by substantial evidence. Such is not the case here. Terri-

tory v. Gonzales, 11 N. M. 301, 68 P. 925; Territory v. Emilio, 14 N. M. 147, 89 P. 239; Territory v. Cheney, 16 N. M. 476, 120 P. 335; State v. Ancheta, 20 N. M. 19, 145 P. 1086. State v. Nabors, 33 N. M. 324, 259 P. 616, just decided, is entirely different from the case at bar, and is not here controlling.

The judgment is accordingly affirmed, and it is so ordered.

PARKER, C. J., and BICKLEY, J., concur.