272 P.2d 660

## STATE v. HEISLER.

No. 5652.

Supreme Court of New Mexico.

April 8, 1954.

Rehearing Denied July 14, 1954.

Catron & Catron, Santa Fe, for appellant.

Richard H. Robinson, Atty. Gen., Fred M. Standley, Asst. Atty. Gen., Walter R. Kegel, Asst. Atty. Gen., for appellee.

SADLER, Justice.

The defendant was convicted of first degree murder and sentenced to death. He seeks upon this appeal to overturn the judgment of conviction, to have set aside the sentence so imposed upon him and to be awarded a new trial. A recital of facts within the verdict of guilty follows.

In the month of October, 1951, the deceased, John Gunnish, of Martin's Ferry, Ohio, was traveling alone in his automobile from his home in Martin's Ferry, Ohio, to California where he hoped to secure work. While passing through Springfield, Missouri, he came upon the defendant on the roadside, apparently looking for a ride. He was hitch-hiking across the country from east to west and to use the defendant's own words, the deceased "stopped to give him a lift." Conversation between the two soon developed that both were California bound and it was agreed between them that defendant could travel with deceased, sharing expenses, on the trip.

Aside from car trouble in Texas from an overheated engine, the trip proceeded without incident until the evening of the second day when the parties stopped for the night a short distance west of Tucumcari, in Quay County where in the district court of that county the defendant was tried and convicted. The car was driven off the main U. S. Highway 66, on which they were traveling, on to the unused portion of an old highway, some 300 feet from the main highway, and there presumably parked for the night, pending resumption of the journey west the following morning. This was on the night of October 11, 1951. On the next afternoon, October 12, 1951, it was reported to the sheriff that a body had been found at the location previously described.

When found, the body was south of the road face down with shirt and trousers on but without shoes. The condition and physical marks of the area surrounding the body strongly suggested that it had been dragged from the edge of what had been the paved portion of the old highway to the point where found some ten feet away. The shirt on deceased was bloody and the pockets open, one of them being turned inside out. Near the body was found a pillow and a five gallon can, later identified by a garage attendant at Shamrock, Texas, as one received from him filled with water, while deceased and defendant were there the day before having work done on the overheated engine. The only identification on the body was a handkerchief in one of the pockets of the pants worn by deceased, bearing the letter "J" on it.

A subsequent examination of the pillow found near the body disclosed in it a lead from a 22 bullet. Upon removal of the body to a funeral home in Tucumcari to determine the cause of death, it was ascertained there were wounds on the neck, face

and hands. Also, fragments of bullets were found in two of the fingers of the deceased. No powder marks or burns were found on the deceased and the bullet wounds were all in the same line of fire. There were five entrance bullet wounds on each side of the face and two exit wounds. There was one wound on each side of the face, below the eye, one in the middle of the chin, and one on each side of the neck, about two inches down from the chin. As indicated, wounds were also found on the hands in one of which the bullet, or a portion of it, was recovered.

Some X-ray pictures were taken. They disclosed a broken jaw, also three bullets, or portions of them, still inside the head and neck of deceased. All of the bullets appeared to have been fired from practically the same position, with the gun in the same position and the path of the bullets through the deceased on the same trajectory, suggesting the probability that the body was in a reclining position when the shower of bullets, five of them, struck the deceased's face.

The automobile of deceased was found abandoned on a street in Amarillo, Texas, on October 17, 1951. An examination of it disclosed numerous blood stains on the back seat and floor of the car and on a blue denim jacket, which had been folded and placed beneath the arm rest on the back seat of the car as though used for a head rest.

On this phase of the case, Sheriff Moncus of Tucumcari testified:

"Q. What type car was it, Sheriff?

A. It was a 1936 Plymouth.

"Q. Was it one seated, or how many doors did it have, Sheriff? A. It was a four door.

"Q. Did you find any blood stains? A. Yes, on the back seat and on the floor and along the, just in front of the door. When the door was closed it would close over the portion of blood. It was from the floor down to the edge of the running board.

"Q. Now, was that the front seat or the back seat, or where? A. No, that was in the back seat. There were a number of articles in the back seat, men's clothing and a bedspread, I believe, and a blue denim jacket, and the jacket was folded and placed in the right hand side of the car, just underneath the arm rest. It had considerable blood on it and then on the cushion and down the side of the cushion and on the floor there was a pool of blood.

"Q. Can you describe the appearance of this denim jacket? A. Yes, the jacket had been folded and placed beneath the arm rest, and it had a hollow in it as though a person had used it for, possibly a head rest."

A pocket novel entitled "They Can't All Be Guilty" was found, along with a pocket book, on the floor of the car. The novel was sent to the Federal Bureau of Investigation in Washington for possible fingerprints. The examination disclosed fingerprints of defendant on the pocket novel. Identification of defendant as the deceased's traveling companion, and information obtained of their movements prior to the homicide, sufficed to warrant the officers in broadcasting a pick up order for defendant. As a result, he was apprehended in Adin, California, on November 1, 1951. He was found to be impersonating his victim, being registered at a hotel under the name of John Gunnish, working and receiving his pay under that name. Following arrest, he admitted taking the deceased's wrist watch, billfold, money and identification cards. He had spent the money taken from deceased in gambling in Reno, Nevada, and had there pawned the wrist watch and gun used by him to kill the deceased.

The deceased had left his home in Martin's Ferry, Ohio, on October 9th, two days before he met his death, with $250. There was ample opportunity prior to the killing, during the course of their seven hundred mile journey together, for defendant to discover that deceased had money.

The defendant took the stand in his own defense and related his version of events transpiring at time of the homicide which he urged in support of his plea for a verdict of acquittal. The justification relied upon was self-defense. According to the story told by defendant, he was born in Brooklyn, New York, and was 30 years of age. He was a deserter from the army at time of the homicide, being "on the run," as he put it, by reason thereof when he met up with deceased. Soon after the two of them had bedded down for sleep on the night in question, deceased being on the back seat of the car and defendant on the front seat, the latter awoke, smoked a cigarette, and dropped off to sleep again. Some time later, he awoke for the second time to find the deceased on the back seat with defendant's suit case open, on seat beside him. He was asked by defendant "What are you doing," whereupon, as defendant stated, the deceased "swung at me" and defendant "swung back at him," and in the ensuing struggle defendant found himself in the back seat where the fight, thus begun, continued. The defendant says he "guesses" that "he was part pushed and part pulled" over into the back seat. Then, continued the defendant:

"Q. Alright, what happened after you found yourself in the back seat of the car? A. Well, we continued to struggle.

"Q. Go ahead. A. Well, I wasn't doing so good, and I got kind of pushed

back a little bit and I had one hand free, and I got hold of the gun.

"Q. Well, were you afraid? A. I'm still afraid.

"Q. What was Mr. Gunnish doing to you? A. Well, he had me in a bear-hug, for one thing, but so far as punches go, I don't think there was too much punching going on, it was more or less a wrestling match.

"Q. Now, was he hurting you? A. I wasn't breathing too good.

"Q. Your breath was cut off? A. Yes, sir.

"Q. And then what happened? A. I got hold of the gun.

"Q. And then what happened? A. We struggled some more and I tried to hit him with the gun.

"Q. Go ahead. A. It wasn't too long and I fired.

"Q. Now, what was he doing all of this time? A. Well, we were still wrestling.

"Q. Well, where did he have hold of you, if any place? A. You mean when the gun went off?

"Q. Well, any place, when you had the gun in your hand, we will say. A. When I had the gun, or he saw the gun, he grabbed my wrist, the gun was in my right hand, I'm right handed.

"Q. Alright— A. He grabbed my wrist. Well, his strength was telling again, and I fired.

"Q. How many times did you fire? A. I don't know.

"Q. And then what happened? A. You mean after I fired?

"Q. Yes. A. I got out of the car.

"Q. What happened to Mr. Gunnish after you fired? A. Well, this is all relatively vague, I mean, everything happened so fast. When the gun went off, it went off like a machine gun, and I remember seeing him grab his face, he slumped and I backed off and everything was too fast for me to make a definite decision as to thoughts or movements or anything.

"Q. Well, now, were you scared at that time? A. Yes, sir.

"Q. Go ahead. A. Well, he slumped back and I backed up and got out of the car."

The defendant continued with his story of events, telling how he took the body of deceased from the car and moved it a short distance away. Next, he took deceased's wallet and other personal articles mentioned from the body of deceased and took deceased's car and drove it to Amarillo, Texas, where he abandoned it. He rode the bus from there to Denver, thence to Reno, Nevada, and finally to Adin, California.

It should be added that the evidence disclosed an appreciable disparity in size between the defendant and the deceased. The garage attendant at Shamrock, Texas, described deceased, Gunnish, as a big "double-jointed" fellow with big arms and muscles. Deceased was 40 years of age at time of death. The garage attendant spoke of defendant as the "little fellow". Actually, the deceased was a large man, having a height of 6 feet 1 inch and weighing about 215 pounds. The defendant is 30 years of age, having a height of 5 feet, 10 inches and weighed 145 pounds at time of the homicide.

Having been apprehended and arrested in California, the defendant was returned to Tucumcari, New Mexico, where his trial took place. The jury apparently placed little credence in defendant's story of how the homicide occurred. He was convicted of first degree murder and given a death sentence. This appeal followed.

Counsel for the defendant assert and argue error in three respects, claimed to have been committed by the trial court, in their effort to secure a reversal of the judgment below and the award of a new trial. The grounds so relied upon may be summarized as follows:

(1) Error in giving and refusing instructions on the law of self-defense.

(2) Error in admitting in evidence, over defendant's objection, State's exhibits 1 to 6 consisting of certain articles of clothing and wearing apparel worn by deceased at time of his death.

(3) Error in permitting the sheriff while testifying as a state's witness to give his opinion as to the position of deceased and appellant at the time of the shooting.

These claims of error will be discussed and resolved in the order of their listing, next above. The first point being claimed error in the giving and refusal of certain instructions, all relating to the plea of self-defense, we shall give our first attention to it. The position of the attorney general on this claim of error is simple and, if well taken, decisive. He meets it head on by asserting that the facts in evidence did not warrant submitting the issue of self-defense. Hence, in so far as the jury was instructed at all on that subject, the defendant got more than he was entitled to on the evidence and the error, if any, in the instructions so given may not be made the basis of a reversal.

That error may not be predicated on the refusal to instruct on self-defense where the evidence does not warrant submission of the issue is well settled. 4 Warren on Homicide (Perm. Ed.), p. 271; Thomason v. Territory, 4 N.M., Gild., 154, 13 P. 223; Territory v. Baker, 4 N.M., Gild., 236, 13 P. 30; Territory v. Ayer, 15 N.M. 581, 113 P. 604; State v. Aragon, 35 N.M. 198, 292 P. 225; Hicklin v. Territory, 9 Ariz. 184, 80 P.

340; Walker v. State, 52 Ariz. 480, 83 P.2d 994; Coffman v. State, 73 Tex.Cr.R. 295, 165 S.W. 939; Yeager v. State, 109 Tex.Cr. R. 213, 3 S.W.2d 808; McLaughlin v. State, 127 Tex.Cr.R. 390, 76 S.W.2d 768; Dillon v. State, 137 Wis. 655, 119 N.W. 352, 16 Ann.Cas. 913.

In Thomason v. Territory, supra, the Territorial Supreme Court considered claimed error in the refusal to instruct on self-defense. It said [4 N.M. 154, 13 P. 227]:

"There was no evidence whatever before the jury tending, in the slightest manner, to show a killing in self-defense; so there was no error in the refusal to instruct respecting the law of self-defense."

Again, in Territory v. Baker, supra, error was claimed in the instructions on self-defense but the court held the claimed error was unavailable to defendant. The court said:

"The court below was more liberal in its instructions to the jury on the subject of self-defense than defendant had any right to demand; and, although such instructions did not go to the full extent permitted by our statute in not submitting to them the question as to whether there was reason to apprehend a design on the part of the deceased to do the defendant great personal injury, and that there was imminent danger of such design being accomplished, the de-

fendant cannot be prejudiced by such instruction, for the reason that the facts proven in the case did not warrant an instruction on the subject of self-defense at all."

In State v. Aragon, supra, we said [35 N.M. 198, 292 P. 227]:

"The right of self-defense is not a speculative one, but a substantial one, when these requirements are fully met. The court would have committed error against the state had it charged upon the law of self-defense."

In Yeager v. State, supra, [109 Tex.Cr.R. 213, 3 S.W.2d 809], the court dealt with the question in the following language, to-wit:

"Various complaints are made with reference to the failure to properly charge self-defense and the improper references to self-defense contained in the court's charge. We do not think the evidence, fairly considered, raised the issue of self-defense. Appellant himself testified that after he was hit, or slapped, 'he struck her before he thought.' She had slapped him, after which he cut her, but there is no testimony to show that she was making any further attempt to attack him or that he believed that she was or that it reasonably so appeared to him or that he believed he was in any kind of danger. On the contrary, he claims he stabbed her without thinking. This disposes of

454

all these various contentions, as any reference to self-defense in the court's charge, or any charge upon self-defense, would be favorable and not prejudicial to the accused. If there is testimony raising any issue of self-defense, it is too remote and trivial to justify its submission."

The holding of the court in McLaughlin v. State, supra, is in line with our conclusion in this case on the same question. The court said [127 Tex.Cr.R. 390, 76 S.W.2d 771]:

"* * * The appellant insists that the court should have charged the law of self-defense as if he had been attacked under circumstances from which he apprehended death or serious bodily injury at the hands of deceased. The appellant testified that she had no pistol; that the only thing she attacked him with was a little hand mirror which he took away from her and disarmed her. He did not testify that he was in fear of death or serious bodily injury at her hands, and therefore the charge which he insists should have been submitted was not authorized."

■ A test applied by the Supreme Court of Arizona in Walker v. State, supra, when related to the evidence before us on the issue of self-defense leaves us well satisfied of the correctness of our conclu-

sion that it did not suffice to call for instructions on the subject. The court said:

"The only material question raised by the appeal is whether the trial court erred in refusing to instruct the jury on the issue of self-defense. It is the law in most jurisdictions that if there is evidence appearing in the record which would raise a reasonable doubt as to whether the homicide with which a defendant is charged was committed in self-defense, it is the duty of the trial court to instruct upon that issue whether the evidence raising it is brought out by the state or by the defense, and a failure to so instruct is error. Graham v. State, 98 Ohio St. 77, 120 N.E. 232, 18 A.L.R. 1272; Underhill, Crim. Ev. Sec. 51, p. 50. We think this is the law in Arizona also. On the other hand, if the evidence in the case is insufficient to raise a reasonable doubt as to whether a defendant accused of a homicide did act in self-defense, any instruction on that issue is properly refused. Hicklin v. Territory, 9 Ariz. 184, 80 P. 340; Judd v. State, 41 Ariz. 176, 16 P.2d 720.

* * * * * *

"With this statement of the law, does the evidence tend to show the elements necessary to sustain self-defense? After a careful consideration, we think it does not. According to defendant's

own testimony, he was attempting to interfere in a struggle between two other parties when he was caught around the body by deceased. He does not contend that at this time any of those present showed any signs of having any dangerous weapons in their possession, or that he then feared any injury from deceased, or indeed, from any other person, or that he considered it necessary to protect himself therefrom by taking the life of another. He was merely engaged in a scuffle with the deceased, which would be characterized at most as a simple assault. During this scuffle, in some manner a pistol appeared upon the scene. All of the witnesses, except defendant, say it was in the possession of defendant from the beginning of the scuffle to the end. He says it was not, but that he gained its possession from some unknown party whom he supposed to be the brother-in-law of deceased. But he does not say that at the time he seized the pistol, or indeed at any time he had any fear of serious injury by any person. He was, to his knowledge, in possession of the only weapon which had appeared on the scene of action. There was nothing to indicate any other weapon was in the possession of any other person. Under these circumstances, we think there was nothing to justify any reasonable man in believing that de-

fendant was in such danger just before he became unconscious that it would justify him in taking a human life, nor indeed that he ever had any such a fear, much less that he was acting on such fear alone. And, as we have said, even on the most liberal theory of the law, if up to the time he became unconscious the situation did not justify him in killing deceased in necessary self-defense, nothing that arose thereafter could have produced such justification. If the evidence did not justify an instruction on self-defense, it was not error for the court to refuse to give it."

It remains for us to examine the evidence in this case in the light of the law as declared in the foregoing authorities to determine whether it fairly raises the issue of self-defense calling for instructions on the subject. In doing so we are not unmindful of the rule that where self-defense is involved in a criminal case and there is any evidence, although slight, to establish the same, it is not only proper for the court, but its duty as well, to instruct the jury fully and clearly on all phases of the law on the issue that are warranted by the evidence, even though such defense is supported only by the defendant's own testimony. State v. Martinez, 30 N.M. 178, 230 P. 379, and State v. Martinez, 39 N.M. 290, 46 P.2d 657.

We give full force to this doctrine; nevertheless, to call for an instruction on the subject, the evidence may not be so slight as to be incapable of raising a reasonable doubt in the jury's mind on whether a defendant accused of a homicide did act in self-defense. Walker v. State, supra. It is with this limitation on the rule announced in the two cases of State v. Martinez, supra, that we are here concerned. We are constrained to give it as our considered judgment that the evidence before us on the subject fails to measure up to the test which called upon the trial court to instruct. on self-defense.

■ It is to be remembered that at the time of the homicide, the defendant was armed, the deceased was not. Taking him at his own word, up to the time the defendant produced his gun, to say the least, and under a fair appraisal of his testimony, throughout the struggle, not a word was spoken by the deceased. He made no threat against the defendant. Asked specifically these questions, the defendant made answers as shown, to-wit:

"Q. Did Mr. Gunnish say anything to you? A. No, sir.

"Q. Did he say, I'm going to kill you? A. No, sir.

"Q. Did he say anything? A. Not that I remember.

"Q. You say, he saw the gun? A. Yes, sir.

"Q. And you had it in your right hand? A. Yes.

"Q. And he had hold of your right wrist? A. Yes, sir.

"Q. Is that right? A. Yes, sir."

The nearest defendant ever came to quoting a single word from deceased's mouth is to be found in this transcript of his testimony:

"Q. What conversation took place between you and Mr. Gunnish, if any?

A. I asked him what the hell he was doing.

"Q. And then what was said? A. After that there was only swear words."

Notwithstanding the superior size and strength of deceased, he did not strike defendant a single solid blow, a "grazing blow" being the most he would admit receiving. He made no attempt to choke or strangle the defendant, in a contest described by the latter as "more or less of a wrestling match." Let's have it in his own words:

"Q. What was Mr. Gunnish doing to you? A. Well, he had me in a bear-hug, for one thing, but so far as punches go, I don't think there was too much punching going on, it was more or less a wrestling match."

Where, then, in defendant's testimony, is there evidence to support an inference of that grave danger of "death or great bodily harm," reasonably apprehended, on which

he can justify the taking of human life? Of necessity, it must arise on the inference to be drawn from the fact that deceased had him in a sort of "bear-hug," which was cutting off his breath and he "was afraid." Here is testimony on the very point:

"Q. Now, was he hurting you? A. I wasn't breathing too good.

"Q. Your breath was cut off? A. Yes, sir."

The defendant specifically declined to say he feared for his life. He stated on direct examination:

"Q. Did you tell Mr. Moncus and Mr. Breen that you feared for your life? A. Yes, sir.

"Q. And, did you fear for your life? A. Well, I knew that I wasn't going to win, and I didn't know what was going to happen after that. I was plenty scared."

"Scared!" Scared of what? He knew he wasn't going to win. The only contest under way was what defendant described as "more or less a wrestling match." Was it the loss of this contest, he feared? This man was on trial for his life and, yet, declined to come right out and say he feared either "death" or "great bodily harm" when the question was put squarely to him.

And when we recite the high point in defendant's testimony, it fairly discloses at the very time the supposed "bear-hug" was taking place, it was a "one armed" bear-hug, for with the other hand the deceased was grasping the wrist of the hand in which defendant held the gun. Again we quote from his testimony:

"Q. Well, where did he have hold of you, if any place. A. You mean when the gun went off?

"Q. Well, any place, when you had the gun in your hand, we will say. A. When I had the gun, or he saw the gun, he grabbed my wrist, the gun was in my right hand, I'm right handed.

"Q. Alright— A. He grabbed my wrist. Well, his strength was telling again, and I fired."

The foregoing is a fair appraisal of the testimony on which defendant relies to predicate his plea of self-defense. To uphold it as sufficient to warrant an instruction on the subject would license any participant in a physical combat waged between two men with hands and fists, thinking himself about to be the loser, to slay his opponent with whatever weapon he could lay his hands on. We are not prepared to approve such a doctrine. The evidence did not authorize instructions on the law of self-defense. Had the deceased been on trial for killing defendant, we could hardly say the same.

■ The second claim of error, as pointed out above, predicates error on the

admission in evidence over defendant's objection of state's exhibits 1 to 6. They were certain articles of wearing apparel worn by deceased at the time of his death, consisting of (a) a shirt, (b) a pair of socks, (c) a suit of underwear, (d) a pair of trousers, (e) a handkerchief and (f) a belt. When first offered, the State tendered the exhibits in evidence on the issue of identification and establishment of the corpus delicti. The court at that time rejected the tendered exhibits. Later on, however, and following the second tender, they were admitted as tending to prove identification, motive and corpus delicti. The objection was that it was demonstrative evidence and that the State had not shown the sheriff, who as a witness identified the exhibits, was not capable of describing the exhibits to the jury and for the further reason that the sole purpose in introducing the articles of clothing worn by the deceased was for the purpose of inflaming the minds of the jurors.

On the second tender, the exhibits were admitted and counsel for defendant argue before us that the trial court abused its discretion in so doing. We find no abuse of discretion in the trial court's ruling. The articles described as State's exhibits 1 to 6 all tended in some degree to prove identity of the deceased, the motive for the homicide and corpus delicti. At the time they were offered, the defendant was standing on his plea of not guilty and the identity of the deceased had not been admitted. A handkerchief was found on his body bearing the first letter, "J", of deceased's christian name, "John." The trousers with some of its pockets either open or turned inside out certainly had some tendency to show motive. The clothing helped the widow to identify the deceased and served to corroborate the identification established by other means.

The court did not abuse its discretion in admitting the clothing of deceased in evidence. Territory v. Lobato, 17 N.M. 666, 134 P. 222, L.R.A.1917A, 1226; State v. Romero, 24 N.M. 351, 171 P. 787; State v. McKnight, 21 N.M. 14, 153 P. 76; State v. Buck, 33 N.M. 334, 266 P. 917; State v. Solis, 38 N.M. 538, 37 P.2d 539; State v. Gallegos, 45 N.M. 404, 115 P.2d 626.

It is finally urged as a ground for reversal that the court committed prejudicial error in permitting Sheriff Moncus while testifying as a witness to give his opinion as to relative positions of the deceased and of the defendant at the time the homicide occurred. It is necessary to quote from the testimony of the witness mentioned in order to give an intelligent understanding of how this question arose at the trial. Questions were asked, answers given and objections made by counsel for the defendant, as follows:

"Q. Sheriff, from the, from your examination and from your investigation of the deceased, from the investiga-

tion of the scene, and from the investigation of the deceased's automobile and all of the surrounding circumstances, I ask you to state, in your opinion—

"Mr. Billhymer: We object to this line of questioning—

"Mr. Breen: I haven't finished, Your Honor.

"The Court: Finish the question.

"Q. In your opinion, can you state to this jury the position of the deceased at the time of the alleged shooting?

"The Court: Don't answer the question.

"Mr. Billhymer: We object because he must show those circumstances from which the Sheriff is basing his opinion.

"The Court: I think we can go back to the testimony yesterday and the circumstances are shown. (Reporter's Note: Consultation of attorneys with the Court.)

"The Court: Overruled.

"Q. Can you answer the question? A. Yes.

"Q. State to the jury what, in your opinion, that position was. A. In my opinion the position of the deceased, was laying down.

"Q. Is that through all shots? A. Yes.

"Q. Sheriff, I will ask you to state from those same circumstances, if you can, the approximate position of this defendant, Frederick Heisler? A. The possible position the way I see it, he wasn't on the back seat.

"Mr. Breen: You may take the witness."

It is to be observed the sole objection interposed to allowing the witness to give his opinion as to position of the deceased at time of the shooting was "because he must show those circumstances from which the sheriff is basing his opinion." That objection in no way questioned the competency of the witness to express his opinion on the subject inquired about. In effect, the objection was that the proper foundation had not been laid to warrant an expression of opinion by the sheriff. As to that objection, the court responded that he could go back to the testimony "yesterday," meaning, of course, testimony of this witness the day before, where "the circumstances *are* shown." (Emphasis ours.) Seemingly, this rejoinder by the court satisfied inquiring counsel on the point made since he registered no further objection to inquiries for the witness' opinion as to deceased's position; and interposed no objection *at all* to the witness giving an opinion on defendant's position at time of the homicide.

▮ It thus appears that counsel for the defendant now seek to put the trial court in

error for letting in this testimony on a ground entirely different from that interposed at the trial. If counsel had informed the trial court they were objecting to the competency of the witness to give an opinion at all on the subject inquired about, rather than that a proper foundation had not been laid, their objection probably would have been sustained and the witness thus denied permission to answer the questions asked. Compare State v. Hernandez, 36 N.M. 35, 7 P.2d 930. In order to take advantage of an error such as this, the trial court must have been informed of the precise ground of objection and have overruled the objection interposed. See State v. Compton, 57 N.M. 227, 257 P.2d 915; State v. Clarkson, 42 N.M. 289, 76 P.2d 1161, and cases cited.

That counsel for defendant did not sense the objectionable character of this testimony is shown by the fact that they interposed no objection at all to the same kind of testimony brought out by State's witness, Dr. A. T. Gordon, who examined the body of the deceased and gave testimony as to the cause of death. Note this transcript of his testimony on the subject, to-wit:

"Q. Doctor, from your examination, and from your training, I will ask you to state, do you have an opinion as to the position of the deceased at the time that the shots were fired? A. The body, the position of the body was, in all probability, was in a reclining position when the bullet struck the face, all five of them. The body was in a more or less stationary position and was possibly held by its weight, I mean lying down or in a semi-reclining position at least, when the bullet struck the face.

"Q. Doctor, can you give your reasons for so stating that? A. The bullet striking the body, if the body was not being held by gravity or by some objects around it in this plane, the body would have moved, because there is enough force from a bullet to definitely move the head if it isn't well supported, and in this case we would expect from the back.

"Mr. Breen: You may take the witness.

"The Court: Cross-examination."

After the foregoing testimony by Dr. Gordon on direct examination, defense counsel took him over on cross-examination in an effort to weaken his opinion testimony on position of deceased's body, but not to question its competency, as follows:

"Q. Now, you stated that the force of the bullet would have caused the head to move, were it not in a stationary position, did you not? A. Yes, sir.

"Q. Now, again, Doctor, wouldn't that depend upon the caliber of the

bullet and the gun used? A. That would, the extent of the, varying degree, depending upon the size, of course the bigger the bullet and the more the speed of the bullet, then the more the movement would be, yes.

"Q. And with a bullet of this caliber, that is a little bullet and there would be a relatively little movement, isn't that right? A. Well, it would be proportionately less.

"Q. And the man, and that would also, another factor would be the size of the man, to determine whether it would move him or it would not move him? A. It would have some effect, yes, sir.

"Q. Those factors would all go to make up, to determine the movement? A. Yes, sir."

■ It may be conceded that upon proper objection, the opinion testimony of both Dr. Gordon and Sheriff Moncus, or that of one of them, as to position of either the deceased or the defendant at time of homicide, might with propriety have been excluded. See Rogers on Expert Testimony (3d Ed.) 531; Blackburn v. State, 22 Ala.App. 561; 117 So. 614; Keifer v. State, 199 Ind. 10, 154 N.E. 870. But, see, Commonwealth v. Dorr, 216 Mass. 314, 103 N.E. 902, and Miera v. Territory, 13 N.M. 192, 81 P. 586, as to expert testimony by doctors or surgeons on a question of this kind. Nevertheless, if objectionable in both instances, it could not be made the basis of a reversal here for want of a proper objection.

■■ This last and final claim of error must be overruled under well-established rules of appellate review. But as to it and certain other errors argued, counsel for the defendant invoke a doctrine seldom employed by us as a basis for reversal. It is one which this Court possesses, inherently, and to be applied solely to prevent a miscarriage of justice, namely, the doctrine of "fundamental error." It was early applied in the case of State v. Garcia, 19 N.M. 414, 143 P. 1012, 1014, where we laid down the conditions for its application, as follows:

"There exists in every court, however, an inherent power to see that a man's fundamental rights are protected in every case. Where a man's fundamental rights have been violated, while he may be precluded by the terms of the statute or the rules of appellate procedure from insisting in this court upon relief from the same, this court has the power, in its discretion, to relieve him and to see that injustice is not done. The restrictions of the statute apply to the parties, not to this court. This court, of course, will exercise this discretion very guardedly, and only where some fundamental right has been invaded, and never in aid of strictly

legal, technical, or unsubstantial claims, nor will we consider the weight of evidence if any substantial evidence was submitted to support the verdict. *If substantial justice has been done, parties must have duly taken and preserved exceptions in the lower court to the invasion of their legal right before we will notice them here."* (Emphasis ours.)

For later cases in which the doctrine has been applied, or its application denied, see State v. Diamond, 27 N.M. 477, 202 P. 988, 20 A.L.R. 1527; State v. Armijo, 35 N.M. 533, 2 P.2d 1075; State v. Garcia, 46 N.M. 302, 128 P.2d 459; Butler Paper Co. v. Sydney, 47 N.M. 463, 144 P.2d 170; State v. Nuttall, 51 N.M. 196, 181 P.2d 808.

This, truly, is not a case to invoke an application of our inherent power under this doctrine. Indeed, we see no miscarriage of justice in the record before us. The jury must have believed the defendant slew his benefactor in the dead of night while he slept. There was evidence to warrant such an inference. Having slain his generous companion, he then took his car, his money and even his name. Compare State v. Blancett, 24 N.M. 433, 174 P. 207. Only such mistakes as the criminal practically always makes in executing his venal crimes disclosed identity of the perpetrator of this heinous offense and brought him to justice. We find in the record before us no ground for applying the doctrine of fundamental error in his behalf.

It follows from what has been said that the judgment of conviction must stand affirmed.

It will be so ordered.

McGHEE, C. J., and COMPTON, LUJAN, and SEYMOUR, JJ., concur.

### On Motion for Rehearing

SADLER, Justice.

The defendant has moved for rehearing, setting up three grounds therefor, all of which actually resolve themselves into one and the same and will be so treated. We thus are confronted with a strong and vigorous challenge to the correctness of the conclusion which forms the basis of our order of affirmance, namely, that the defendant was not entitled to an instruction on self-defense. If he was it may be assumed, as so aptly urged by able counsel for defendant, although we did not pursue the matter to a decision, that there was error in the instructions given on the questioned subject which would call for a new trial. Our disposition of the claim of error on the instructions was the obvious one of commenting, as this court had done in other like cases cited in the opinion filed, that to the extent defendant had any instructions on self-defense, he received more than he was entitled to.

It is said by counsel for defendant that the rule of Walker v. State, 52 Ariz. 480, 83 P.2d 994, one of the cases we cite in support of our conclusion, applies a new test of when the court may with propriety decline to submit self-defense, thus departing from that previously obtaining as announced in the cases of State v. Martinez, 30 N.M. 178, 230 P. 379, 382, Id., 39 N.M. 290, 46 P.2d 657. In these cases, although we spoke abstractly since the precise question was not before us in either case (and quoting from the earlier case) we said:

"Where self-defense is involved in a criminal case, and there is any evidence, although slight, to establish the same, it is proper for, as well as the duty of, the court to instruct the jury fully and clearly on all phases of the law of self-defense that are warranted by the evidence, even though such defense is supported only by the defendant's own testimony."

In Walker v. State, supra, the rule applicable on the subject (and it is quoted in our opinion already filed) is thus stated:

"* * * It is the law in most jurisdictions that if there is evidence appearing in the record which would raise a reasonable doubt as to whether the homicide with which a defendant is charged was committed in self-defense, it is the duty of the trial court to instruct upon that issue, whether the evidence raising it is brought out by the state or by the defense, and a failure to so instruct is error. (Citations omitted.) We think this is the law in Arizona also. On the other hand, if the evidence in the case is insufficient to raise a reasonable doubt as to whether a defendant accused of a homicide did act in self-defense, any instruction on that issue is properly refused."

Taking notice of the language in the Martinez cases, we said:

"We give full force to this doctrine; nevertheless, to call for an instruction on the subject, the evidence may not be so slight as to be incapable of raising a reasonable doubt in the jury's mind on whether a defendant accused of a homicide did act in self-defense. Walker v. State, supra. It is with this limitation on the rule announced in the two cases of State v. Martinez, supra, that we are here concerned. We are constrained to give it as our considered judgment that the evidence before us on the subject fails to measure up to the test which called upon the trial court to instruct on self-defense."

It is on this language of our opinion that counsel chiefly rely to sustain their charge that we depart from the rule adhered to in the Martinez cases and chart a new course by establishing a different and modified

rule. We do not so view the matter. Indeed, when what we say in the Martinez cases is properly understood, there is in truth no difference at all between the rule in Arizona and our own rule on the subject discussed. When we read the abstract statements in the Martinez cases, where the precise question was not involved, in the light of the language employed in State v. Aragon, 35 N.M. 198, 292 P. 225, 227 (also cited in our opinion on file) where the identical question was presented, we readily sense that there actually is no difference between the Arizona Supreme Court and our own on this subject. After reviewing the facts in that case, where we held the court properly declined to instruct on self-defense, we said:

"* * * From a reading of the record, it seems plain that deceased did not strike first. The most that may be claimed by appellant is that deceased 'shoved' him. There is no substantial evidence warranting a belief by appellant that deceased entertained an apparent design to take his life or inflict some great bodily harm upon him."

As the opinion in State v. Aragon suggests and an examination of the record confirms there was *some* evidence of self-defense tendered, upon an appraisal of which counsel for the defendant placed great reliance in making practically the same argument here presented to show error in the trial court's refusal to submit the issue to the jury. It was not evidence of sufficient probative force, however, to satisfy either the trial court or this court that it was capable of creating in the jury's mind a reasonable doubt as to whether the defendant acted in self-defense, State v. Walker, supra; or, to express it differently, it was deemed "too remote and trivial" to support submission of the issue to the jury. Yeager v. State, 109 Tex.Cr.R. 213, 3 S.W.2d 808. But employing either mode of expressing the thought, viz., that found in State v. Walker, supra, or its equivalent as quoted from Yeager v. State, supra, each differs but little in form and, we think, none at all in meaning from the language employed by us in State v. Aragon quoted above in sustaining the trial court's refusal to submit self-defense, where we said there was no "substantial evidence warranting a belief by appellant that deceased entertained an apparent design to take his life or inflict some great bodily harm upon him."

It is argued that the disparity in size and apparent physical strength of the defendant and the deceased adds weight to the claim of error in refusing to submit the issue of self-defense. The same argument was made in briefs filed on the original hearing and was not overlooked by us in entering our order of affirmance. As a matter of fact, the question of disparity in

size of the parties involved seems somewhat in the nature of an afterthought, in so far as it might have affected the right to an instruction on self-defense. Neither the accused in his testimony, nor his counsel by anything said or done thereafter, attached noticeable weight or significance to such disparity as the testimony showed. Under the circumstances, the disparity mentioned may not be successfully invoked to bring the evidence within the test entitling the accused to instructions on self-defense.

We have given this case throughout the intensive study and consideration which the extreme penalty imposed on defendant, or on any defendant in such cases, inevitably enjoins. The constitutional guaranties carried in the bill of rights for the protection of an accused on trial have been accorded him in the trial of his case. He has had a fair trial below and has been ably represented in this court by experienced counsel. They have left no stone unturned in presenting the defendant's claims of error in the most favorable light possible. We have weighed those claims and the arguments supporting them with scrupulous care. Always we come back to the conclusion announced in the opinion on file that no reversible error was committed by the court below and that its judgment should be affirmed.

It follows from what has been said that the motion for rehearing is not well taken and should be denied.

It is so ordered.

McGHEE, C. J., and COMPTON, LUJAN, and SEYMOUR, JJ., concur.